IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

UNITED STATES OF AMERICA,   :
    Plaintiff,              :
vs.                         :  CIVIL ACTION
                            :  NO. 4:11-CV-38(CDL)
21,175.00 IN UNITED STATES  :
FUNDS,                      :
    Defendant.              :
-----------------------------

COLUMBUS, GEORGIA    1:05 P.M.    DECEMBER 20, 2011

The deposition of **TERRANCE DURR** is being taken by the Plaintiff; testimony is being given before Sarah E. Peters, Georgia Certified Court Reporter 2775, in the offices of U.S. Attorney's Office on December 20, 2011, beginning at approximately 1:05 p.m.

------------------------------------------------

APPEARANCES:

For the Plaintiff:   MR. DANIEL BENNETT
                     U.S Attorney's Office
                     300 Mulberry Street, 4th Floor
                     Macon, Georgia 31201

For the Defendant:   MR. DUSTIN J. FOWLER
                     185 North Oates Street
                     Dothan, Alabama 36301

Also Present: Ellie Parker

---

**DISCLOSURE**

STATE OF GEORGIA      Deposition of: TERRANCE DURR
COUNTY OF BIBB:       Date: December 20, 2011

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter and ma here as a representative of Court Reporting Associates, Inc.

I am not disqualified for a relationship of interest under the provisions of O.C.G.A. §9-11-28(c).

Court Reporting Associates, Inc., was contacted by the offices of US Attorney's Office to provide court-reporting services for this deposition.

Court Reporting Associates, Inc., will not be talking this deposition under any contract that is prohibited by O.C.G.A. §15-14-37 (a) and (b).

Court Reporting Associates, Inc., has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Court Reporting Associates, Inc., will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

                    _____
                    Sarah Peters, GCCR 2775

---

STIPULATIONS:

MR. BENNETT: Mr. Durr, my name's Dan Bennett. I'm an Assistant U.S. Attorney in the Middle District of Georgia and we're here today for your deposition in Civil Case No. --

MR. FOWLER: Put on the record usual stipulations?

MR. BENNETT: Yeah. One second. Civil Case No. 411-CV-38CDL. We will do the normal stipulations. Just to be clear though, objections, other than the form of the question reserved, and then the other stipulation is that he'll waive read and sign; is that correct? It's up to you.

MR. FOWLER: Yeah, we'll waive that.

MR. BENNETT: So then this is the deposition of Terrance Durr, taken pursuant to subpoena. This transcript that will be prepared from this could be used for all purposes permitted under the Federal Rules of Civil Procedure.

3

---

TERRANCE DURR
having first been duly sworn by the
court reporter, testified on
CROSS-EXAMINATION
BY MR. BENNETT:

Q  Mr. Durr, have you ever had your deposition taken before?

A  No, I haven't.

Q  Basically, the gist of it is I'm going to ask you questions and you're going to answer my questions and then the nice young lady down there is going to take down what we all say and there'll be a transcript prepared at the end of it. If at any point you want to take a break, you let me know and we'll take a break. And if at any point you want to ask your lawyer a question about a question -- something I've asked you, I have no problem just -- you just let me know and I'll take a stroll and go visit with my friends down the hall and then I'll come back and we'll continue. So I say that in all seriousness; if you need that, you're welcome to take it.

A  Yes, sir.

Q  In addition, I will ask you questions, I will do my best to be very clear in what I'm asking. It occasionally happens that I ask a question that is less

4

**Page 5**

1  than clear and if I do that and I ask you a question
2  that you don't understand or just doesn't make sense,
3  let me know and I'll be happy to rephrase it and ask
4  the question again. And finally, I think I already
5  said this, but if you want to take a break at any
6  point, you know. Do you have any questions about those
7  preliminary instructions?
8  **A   No, sir.**
9      MR. BENNETT:  For counsel, at any point
10  when you want to chime in and ask me to clarify
11  something or to -- you know, just discuss
12  something or --
13      MR. FOWLER:  Excluding the usual
14  objections, something we have started doing, if
15  you ask him his Social, we'd ask that
16  everything but the last four digits be
17  redacted.
18      MR. BENNETT:  Certainly, that'd be fine.
19  And also, like I said, if you have anything you
20  want to discuss, just at some point let me
21  know, we'll go off the record, we'll talk about
22  it.
23      MR. BENNETT: Q   All right. Those are the
24  ground rules. Mr. Durr, tell me, sir, where were you
25  born?

**Page 6**

1  **A   Dothan, Alabama.**
2  Q   Did you grow up there?
3  **A   Yes, sir.**
4  Q   Now, did you complete high school?
5  **A   Yes, sir.**
6  Q   Graduated from 12th grade?
7  **A   Yes, sir.**
8  Q   Did you go to college, at all?
9  **A   No, sir.**
10  Q   You can read and write English?
11  **A   Yes, sir.**
12  Q   Is it fair to say at some point -- I'd also need
13  upon the record, I apologize, there is apparently --
14  there is some sort of construction going on in the
15  building, so we've got the background noise of drilling
16  and I might just stop at some point, if it gets to be
17  too loud.
18      Okay. At some point, is it fair to say that
19  you ran into some trouble with the law?
20  **A   Yes, sir, I have.**
21  Q   And we're not going to go through all of that,
22  but I am interested in talking a little bit about the
23  federal conviction. Is it correct you've only been
24  convicted one time in Federal Court?
25  **A   Yes, sir.**

**Page 7**

1  Q   Okay. And what was that for?
2  **A   Drug conspiracy.**
3  Q   What kind of drugs?
4  **A   Crack cocaine.**
5  Q   And when was that?
6  **A   1996.**
7  Q   And how long did you serve?
8  **A   Seven years.**
9  Q   So you got out in what year?
10  **A   2003.**
11  Q   And when you got out, were you on a period of
12  supervised release?
13  **A   Yes, sir.**
14  Q   How long was that; do you recall?
15  **A   Six -- five years.**
16  Q   And then did you have any problems while on
17  supervised release?
18  **A   I had a couple of incidents, yes, sir.**
19  Q   Did you ever have to go back into prison for
20  that?
21  **A   No, sir.**
22  Q   And so, all said, you were clear of supervised
23  released roughly what date -- what year?
24  **A   2008.**
25  Q   Okay. Now, since 2008, have you had any other

**Page 8**

1  state convictions?
2  **A   Since 2008?**
3  Q   Yes, since you went off federal supervision.
4  **A   No. No, sir.**
5  Q   Have you been arrested for anything?
6  **A   Yes, sir.**
7  Q   What were you arrested for?
8  **A   Domestic violence.**
9  Q   And what year were you arrested for domestic
10  violence?
11  **A   This year.**
12  Q   In 2011?
13  **A   Yes, sir.**
14  Q   Is that the incident where you were shot?
15  **A   Yes, sir.**
16  Q   Other than that incident, is there any other
17  instance where you've been arrested since 2008?
18  **A   Yes, sir. Yeah. Yes, sir, last year.**
19  Q   Last year?
20  **A   Yes, sir, a DUI.**
21  Q   So one domestic violence incident in 2011?
22  **A   Yes, sir.**
23  Q   One DUI in two thousand --
24  **A   '10.**
25  Q   But nothing else with drugs?

**Page 9**

1  A    No, sir, not at all.
2  Q    Now, let's move ahead to the year 2010. Now,
3  I'm just going to give you a little bit of instruction
4  before we go into this next series of questions. What
5  I'm interested in is the year 2010, so everything I'm
6  asking you, I want you to think about 2010.
7  A    Yes, sir.
8  Q    For the record, the traffic stop in this case
9  occurred on October 30th of 2010, so I'm really
10 interested in the period of time before your traffic
11 stop; is that clear?
12 A    Okay.
13 Q    So in 2010, where were you living?
14 A    I was staying in Ozark with my grandma.
15 Ozark, Alabama.
16 Q    Now, at that time, did you own a house anywhere
17 else?
18 A    No, sir.
19 Q    So you were just living with grandma?
20 A    Yes.
21 Q    Were you paying her rent or just staying with
22 her as a relative?
23 A    Light bill.
24 Q    I'm sorry?
25 A    Just paying the light bill.

**Page 10**

1  Q    Paying the light bill?
2  A    Yes, sir.
3  Q    How much did the light bill -- I'm asking you
4  for an estimate, I just want a sense, what does the
5  light bill run?
6  A    Probably just give her a hundred, hundred a
7  month.
8  Q    Fair enough. And other than $100 light bill,
9  did you have any other living expenses during 2010? By
10 that, I mean did you pay for groceries? Did you pay
11 for anything else at the house?
12 A    No, sir.
13 Q    So just basically a hundred bucks and lived with
14 grandma?
15 A    Yes, sir.
16 Q    Sir, do you have any children?
17 A    Yes, sir.
18 Q    I don't want to hear their names, but can you
19 just tell me their ages, so I get a sense of how many
20 children you have and how old they are?
21 A    20 and six.
22 Q    Now, do you pay child support for the
23 6-year-old?
24 A    No, sir.
25 Q    You do not. Okay. Now, where does the mother

**Page 11**

1  live, the mother of the 6-year-old? See, that's an
2  example of my question. You know what I'm asking, but
3  I didn't ask it very clearly. Where does she live?
4  A    She stay in Kensey, Alabama.
5  Q    Now, and the 6-year-old lives with her?
6  A    Her.
7  Q    Now, do you own a vehicle?
8  A    Yes, sir.
9  Q    Do you own it outright or do you pay a note on
10 it?
11 A    A note.
12 Q    What's your note -- what's your monthly note?
13 A    I got a Chevrolet Impala, which is $200 -- $205
14 a month.
15 Q    Now, did you have that car back in 2010, as
16 well, or is that a car you've got now?
17 A    That's a car I got in 2010, got like August of
18 2010.
19 Q    August of 2010?
20 A    Yeah.
21 Q    So you had that car note roughly around the time
22 of the traffic stop; is that fair?
23 A    Right.
24 Q    Now, your salary in 2009 -- for tax year 2009
25 was approximately $31,000; is that correct?

**Page 12**

1  A    Right.
2  Q    And was it in 2010, did you have roughly -- did
3  you make roughly the same amount?
4  A    Yes, sir.
5  Q    Right around 31 or $32,000?
6  A    Yes, sir.
7  Q    So you're making $32,000 a year in 2010, or
8  thereabouts, and all these amounts are approximate, I'm
9  not trying to trick you with the amount, I'm just
10 trying to get a sense of it. So you're making $32,000
11 a year; is that correct?
12 A    Yes, sir.
13 Q    You have a $100 a month light bill?
14 A    Right. Yes, sir.
15 Q    You've got a $200 or so car note?
16 A    Right.
17 Q    All right. Other than that, are there other
18 expenses that you have -- your month, do you have any
19 other monthly expenses?
20 A    Cell phone.
21 Q    Give me a sense of the cell phone. Fifty bucks,
22 a hundred bucks?
23 A    No, about 100, $120 a month.
24 Q    $120 month for the cell?
25 A    Yes, sir.

**Page 13**

1  Q   All right.  Anything else?
2  A   I had got a loan back in '08, I think -- '07,
3  that's like $114 a month.
4  Q   So 114 a month --
5  A   Right.
6  Q   -- for the loan?
7  A   Right.  Credit card, 135.
8  Q   Is that a minimum payment?
9  A   Yeah.  Well, sometimes it goes like 85 to 135.
10 Q   Sounds good.  What kind of balance do you hold
11 on that card?
12 A   Probably now it's like 4,000.
13 Q   Any other monthly expenses right around that
14 time in 2010 that you can think of?
15 A   I had -- well, sir, I really don't have no
16 bills.  That is about it.
17 Q   And for the record, where were you working in
18 2010?
19 A   Adams Beverages.
20 Q   Is that somehow affiliated with Budweiser?
21 A   Oh, yeah.  Yes, sir.
22 Q   Is that like a -- explain the relationship
23 between Adams and Budweiser for me.  Is it a
24 distributor or what is it?
25 A   Distributor.

**Page 14**

1  Q   What would you do for Adams and, again, just
2  focusing on 2010, what were you doing for them in that
3  year?
4  A   Draft technician.
5  Q   What does that mean?
6  A   I go around and start draft units in bars, clean
7  the lines and fix them.
8  Q   And you were paid a salary for that?
9  A   Yes, sir.
10 Q   And so how does Adams pay you guys?  Are you
11 paid -- or pay you, are you paid bi-weekly, are you
12 paid -- or bi-monthly, rather?  Are you paid --
13 A   Bi-weekly.
14 Q   I mean every two -- you get paid every two
15 weeks?
16 A   Every two weeks.
17 Q   Okay.  That's what I meant.  How much would you
18 get paid every -- after, you know, taxes are taken out
19 and everything, what was your take-home every two
20 weeks?
21 A   My take-home was like $1020 -- $25 or something
22 like that, $1030, something like that.  Might have been
23 more than that.  I can't --
24 Q   I'm asking you for approximate amounts, so --
25 A   Oh, okay.  Okay.

**Page 15**

1  Q   -- I'm not -- if the tables were -- I will say
2  if the tables were turned and you were asking me these
3  questions, I would be struggling to tell you exactly
4  the right amount, so just -- I understand.  I'm just
5  trying to get a sense of it.  So a thousand bucks in
6  your paycheck.  How would Adams pay?  Would it be a
7  check or a direct deposit?  How did that happen?
8  A   Direct deposit.
9  Q   Where would they direct deposit the money to?
10 A   Army Aviation.
11 Q   Is that fair to say that's into a checking
12 account?
13 A   Yes, sir.
14 Q   Is that the only account you have?
15 A   Yes, sir.
16 Q   You don't have any other savings accounts
17 anywhere?
18 A   Just there.  Just Army Aviation.
19 Q   So with that background in mind, let's turn a
20 little more specifically to the traffic stop.  So let's
21 go back to the day before the traffic stop.  What were
22 you doing on October 29th of 2010, if you remember?
23 A   I worked.  I got off work, lift weights, worked
24 out.  Later on, went to a nightclub.  Left the
25 nightclub about 2:00 o'clock, the 30th, 2:00 o'clock in

**Page 16**

1  the morning.
2  Q   2:00 o'clock in the morning.  All right.  Now,
3  let's get a little more specific.  You said nightclub,
4  what kind of nightclub is it?
5  A   Strip club.
6  Q   And it's in where?
7  A   Dothan.
8  Q   And what's the name of it?
9  A   Playboy Palace.
10 Q   So it's a strip club in Dothan?
11 A   Yes, sir.
12 Q   How far do you live away from the strip club?
13 A   Ozark.
14 Q   Ballpark?  Hour drive?  Half hour drive?
15 A   Half hour.  Probably like 20 minutes.
16 Q   So you got off -- do you remember what day of
17 the week it was on the 29th of October in 2009?
18 A   Friday.
19 Q   So you get off of work on a Friday.  You go to
20 the strip club; is that correct?
21 A   No, sir, go lift weights.
22 Q   Lift weights, yes, sir.
23 A   Yes, sir.
24 Q   Go lift weights and then you head to the strip
25 club?

**Page 17**

1  A   Went to the strip club later on, yes, sir.
2  Q   You were there from -- approximately how long
3  were you there, how many hours?
4  A   I went to the strip club probably around about
5  11:00 and left like 2:00.
6  Q   11:00 and 2:00?
7  A   I think.
8  Q   And then do you have a sense of how much money
9  you spent that night there?
10 A   I can't remember.
11 Q   Fair enough.  Now, did you have a lot of
12 currency on you when you went to the club?
13 A   No.
14     MR. FOWLER:   Object to the form.
15 MR. BENNETT: Q   How much currency did you have
16 on you, if you recall?
17 A   I probably had about $600 on me, I guess, I
18 think.  I can't remember, yeah, really definitely how
19 much but --
20 Q   You didn't have 21,000 on you?
21 A   No.  No.  No.
22 Q   So you had about 600?
23 A   Six, 700, yes, sir.
24 Q   It's 2:00 a.m., you leave the strip club.  Where
25 do you go?

**Page 18**

1  A   I went home.
2  Q   Did you go to sleep at that point?
3  A   Yes, sir.
4  Q   Well, tell me what happened next.
5  A   My friend, Jerry Lett, which is a ex door -- ex
6  next-door neighbor, he came and picked me up from the
7  house and took me to Atlanta.
8  Q   Now, let's talk a little bit about that.  When
9  had you decided that you were going to go to Atlanta?
10     MR. FOWLER:   Object to form.
11 THE WITNESS: A   Probably all that week more
12 than likely.  Yeah, all that week.
13 MR. BENNETT: Q   What was the purpose of your
14 trip to Atlanta?
15 A   To go get some houses out of foreclosure, to
16 check on them and see how much it was going to cost to
17 get them out and make -- prepare the houses.
18 Q   We'll talk more about that later.  So?
19 A   Okay.
20 Q   Okay.  That was the stated -- that was the
21 purpose of the trip; correct?
22 A   Yes, sir.
23 Q   And you decided earlier in the week you were
24 going to do that?
25 A   Yes, sir.

**Page 19**

1  Q   Why was Jerry going to go with you?
2  A   Well, he just -- I just was wanting somebody to
3  ride with me at the time, you know.  That's all.
4  Q   And how long had you known Jerry at that point?
5  A   2006.
6  Q   You said you were next-door neighbors?
7  A   Yes, sir.
8  Q   Are you still friends with him?
9  A   Yes, sir, we talk sometimes.
10 Q   Now, why was he driving?
11 A   Well, I had -- my license was suspended, yeah.
12 Q   Why was your license suspended?
13 A   The DUI, 2010, they took my license
14 automatically.
15 Q   So he was basically giving you a ride?
16 A   Yes, sir.
17 Q   Now, whose car was that?  Who owned the car?
18     MR. FOWLER:   Objection to form.
19 THE WITNESS: A   I really don't know who owned
20 that car, but he was always on it, so --
21 MR. BENNETT: Q   You don't know the owners of
22 that car?
23 A   No, sir.
24 Q   So if I asked you who Cedric Dion Goode is,
25 you're not going to know who that is; is that correct?

**Page 20**

1  A   No, sir.  Correct.
2  Q   Also, if I asked you if you knew who Terry
3  Williams is?
4  A   Don't know him.
5  Q   Did either you or Jerry Lett consume alcohol in
6  the car?
7  A   No, sir.
8  Q   Let me ask it this way:  When did you take your
9  last drink?
10 A   It was probably around --
11     MR. FOWLER:   Object to form on that.
12 THE WITNESS: A   -- 1:00 -- probably 1:00
13 o'clock.
14 MR. BENNETT: Q   The night prior?
15 A   That -- yeah, that was the same day.  Well,
16 yeah.
17 Q   I understand.
18 A   Yeah.  Yeah.
19 Q   So we're saying the same thing.  Basically, you
20 had -- that was your last cocktail you had at the strip
21 club?
22 A   Right.  Yes, sir.
23 Q   Now, did you also have some marijuana at the
24 strip club?
25 A   No.  No, sir.

**Page 21**

1  Q   Did you have any marijuana within the 24 hours
2  prior to your traffic stop?
3  A   No.  No.
4  Q   Do you know if Jerry Lett did?
5  A   He didn't.
6  Q   So neither of you had marijuana on -- neither of
7  you had consumed marijuana to your knowledge?
8  A   No, sir.
9  Q   How long had you been driving before you were
10 stopped?
11 A   I kind of fell off and went to sleep.  Probably
12 -- Harrison County, that's probably an hour and a half,
13 two hours maybe.  I don't think that's too far from
14 Atlanta.  I'm not really familiar with the Atlanta area
15 like that.  Like Jerry, he's from up there, too, so he
16 knew his way around.
17 Q   Can you describe what happened once you were
18 stopped?
19 A   Like I say, I was on the passenger side asleep.
20 I heard Jerry, he tapped me, said, hey, man, we're
21 being pulled over.  I say, yeah.  Oh, okay.  I said,
22 you speeding or something?  He said, no, I wasn't
23 speeding, so you want me to tell you everything?
24 Q   Yeah, please do.
25 A   Okay.  So the cop came to my side, asked Jerry

**Page 22**

1  for his license, told him to step out of the car.  I
2  guess, I don't know what he talked to Jerry about in
3  the back.  Came back to my side, asked me for my ID.  I
4  told him I don't have it.  I gave him my name.  And he
5  told me to step out of the car and basically, just went
6  -- asked Jerry Lett can he search the car.  Because
7  Jerry told him no -- I mean yes, he could search the
8  car.  So he searched the car and I guess found my money
9  that I had on my side up under the seat.
10 Q   Now, let me ask you a couple of quick questions
11 about that.  First of all, did the officer pat you down
12 when you got out of the car?
13 A   Yeah, he did that.
14 Q   Now, did he ask you for permission to do that?
15 A   Yeah, he asked permission.
16 Q   And is it true that you had some currency with
17 you?
18 A   In my pocket?
19 Q   Yes.
20 A   Yes, sir.
21 Q   Do you remember how much you had with you?
22 A   I think it was around --
23 Q   Approximate amount is fine.  I'm just curious.
24 A   Probably -- I probably had like 700 with me.  I
25 put some more money back in my pocket because I knew we

**Page 23**

1  was going out, in Atlanta, too, probably, yeah.
2  Q   Now, did the officer ask you if you had any
3  other currency in the car?
4  A   I can't remember if he asked me.  I know he
5  asked Jerry, because he told me that Jerry said there's
6  some money -- I think I remember Jerry told me he had
7  -- he told me that Jerry told him there was some money
8  in the car, so when he searched it, he seen the money.
9  Q   So you don't -- I just want to make sure I
10 understand.  Do you recall if the police officer asked
11 you if you had any other currency in the car?
12 A   Yeah, I think -- yeah, he did.
13 Q   Do you remember what you told him?
14 A   I told him yes.
15 Q   You told him yes?
16 A   Yeah.
17 Q   Did you tell him where it was?
18 A   No.  He just searched it and he found it.
19 Q   Well, what I want to know is did you tell -- so
20 the conversation, the officer asked you do you have any
21 other currency in the car and your response was what?
22 A   I really don't want to say the wrong thing.  I
23 mean as far as I can remember, I think I said yes.  I
24 know I owned up to the money, but I can't remember if
25 he asked me did I have money in the car.  See what I'm

**Page 24**

1  saying?  I can't remember that part.  I know he asked
2  Jerry and Jerry told him yes.
3  Q   Yeah.  I'm not worried about Jerry.
4  A   Okay.
5  Q   I'm worried about -- what I'm trying to ask you
6  and it's kind of important, so I want to make sure
7  we're saying the same thing.  When the officer asked
8  you if you -- let's do it this way.  The officer asked
9  you if he could pat you down; correct?
10 A   Yes.
11 Q   And the officer -- is it true that the officer
12 found some currency at that point?
13 A   Right.  Yes.
14 Q   And then do you recall if the officer asked you
15 at that point, asked you is there any -- do you,
16 meaning you, Mr. Durr --
17 A   Me.
18 Q   -- have any more money in the car?
19 A   No, I don't recall him asking me that.  I don't
20 remember it.  I really don't.
21 Q   No, that's fine.  I just want to make sure that
22 that's your testimony.  Okay.  So you don't recall him
23 asking you that.  So you step to the rear of the
24 vehicle at that point; is that correct?
25 A   Yes, sir.

**Page 25**

1  Q   What happened next?
2  A   Then he went through the car. Jerry came
3  permission to go through the car. Went through the car
4  and he found the money. Then he asked whose money was
5  it. Before I got any chance to even say something --
6  say anything, Jerry said it's his. It's his money, so
7  -- which it was. I said, yeah, it's mine.
8  Q   Now, the very first time that the officer asked
9  about the currency, who owned it? Did you speak up at
10 that point and say it's mine?
11 A   Yes, sir.
12 Q   You did?
13 A   Yeah.
14 Q   And, in fact, it is your testimony that it is
15 your money?
16 A   It is my money, yes, sir.
17 Q   It's not Jerry's money?
18 A   No. No. No.
19 Q   So were you asleep when Deputy Crane pulled you
20 over?
21 A   Yes, sir. I mean I wasn't still asleep, but I
22 was -- when he got behind Jerry, I was asleep. When he
23 pulled us over, I was awoke.
24 Q   Now, I was going to ask you why you didn't have
25 your license with you, but I think I already know the

**Page 26**

1  answer because it was suspended; that's correct, sir?
2  A   That's correct. Yeah.
3  Q   Now, even though your license was suspended at
4  that point, did you have any other identification on
5  you?
6  A   No, I didn't.
7  Q   Let me ask you this: How are you going to be
8  conducting business up in Atlanta if you don't have any
9  identification at all with you?
10 A   Well, I guess Social Security, Social Security
11 number and so forth. I really --
12 Q   But you didn't have any other picture ID on you;
13 is that correct?
14 A   You know what? I had an old, old driver's
15 license, but I told the officer my license was
16 suspended, but it's an old ID, like -- because it
17 wasn't -- it wasn't, you know, accurate, so -- yeah, it
18 was an old ID.
19 Q   Let's get to --
20 A   But I went ahead and told him that it was
21 suspended.
22 Q   Yes, sir. I'm sorry. I didn't mean to
23 interrupt you. Well, let's move ahead to the amount --
24 to the -- you know, the currency that was seized in
25 this case. Do you recall how much exactly it was?

**Page 27**

1  A   21,000.
2  Q   And where was the 21,000 in the car?
3  A   It was in a bag up under the seat of my
4  passenger side.
5  Q   How did the money get into the car?
6  A   Me. I brought it out of the house.
7  Q   Why did you put it underneath the passenger
8  seat?
9  A   Well, because the car's so small and compact on
10 the inside of the car, I just didn't want to be
11 stepping all on it, so I just, you know, pushed it up
12 under the seat. See, in case we're sitting at a gas
13 station or something like that, somebody -- didn't want
14 nobody to see it and get robbed.
15 Q   Now, let's talk about a little bit about this
16 currency. Immediately prior to putting it in the car,
17 where was the currency stored?
18 A   In my house, in my room.
19 Q   Where in your room?
20 A   Closet.
21 Q   Did you take all of the currency from your
22 closet when you put it in the car?
23 A   Yes.
24 Q   Did you or did someone else package it?
25 A   Me.

**Page 28**

1  Q   And in what manner did you package the currency?
2      MR. FOWLER:    Object to form.
3      THE WITNESS: A   Thousand dollar bundles.
4      MR. BENNETT: Q   And what did you use to put
5  them in that -- the currency in thousand dollar
6  bundles?
7  A   Rubber bands.
8  Q   Where did you find the rubber bands?
9  A   I bought them at a Dollar General.
10 Q   Why did you use rubber bands?
11 A   That's just the way I -- that's the way I just
12 -- that's the way I put them in stacks, so.
13 Q   So the $21,000 that was in your closet, how did
14 that $21,000, that precise currency, how did it get
15 into the closet?
16 A   What you mean? As far as --
17 Q   I mean how did you get $21,000 -- I'm just
18 moving the currency backwards from the car to your
19 closet. I want to know did it get in the closet?
20 A   I mean I put it in the closet.
21 Q   Where did you get it from?
22 A   From working over the years.
23 Q   Where did you get the currency itself?
24     MR. FOWLER:    Object to form.
25     MR. BENNETT: Q   Where did you get the cash?

**Page 29**

1   MR. FOWLER:   Object to form.
2   THE WITNESS:  A   By pulling it out the bank from
3   time to time. That's it.
4   MR. BENNETT:  Q   So you would have withdrawal
5   slips from your bank to show you periodically
6   withdrawing cash over time and putting it in your
7   closet?
8   A   Yes, sir.
9   Q   Over what period of time did it take you to
10  accumulate $21,000?
11  A   Ever since I been at -- been there.
12  Q   Been where?
13  A   Adams Beverages.
14  Q   So for how many years is that?
15  A   February 5th it'll be eight years.
16  Q   So it's your testimony that you've slowly
17  accumulated $21,000 in cash over eight years; is that
18  correct?
19  A   Yes, sir.
20  Q   And the $21,000 is derived completely from your
21  wages at Adams?
22  A   Yeah, and also a loan that I go from Army
23  Aviation, the loan I was telling you about, I got a
24  $4,500 loan. And my dad won -- he was gambling down at
25  Country Crossing.

**Page 30**

1   MR. FOWLER:   When it was legal.
2   THE WITNESS:  A   When it was legal, yeah. He
3   won 10,000 and he loaned me 5 until I got my income
4   taxes.
5   MR. BENNETT:  Q   If I'm looking at a stack of --
6   at a pile of currency that's in your closet, break it
7   down for me what money is from the bank, what money is
8   from a loan and what money is from your dad.
9   A   Like I say 5,000 came from my dad.
10  Q   When did he give you that 5,000?
11  A   It's 2010 -- 2010, I forgot which month -- what
12  month in 2010 he gave it to me.
13  Q   He gave it to you in cash?
14  A   Yes, sir, because they gave it to him in cash.
15  I was with him.
16  Q   And you took it from him, and what did you do
17  with it?
18  A   And I put it up.
19  Q   Put it in the closet; right? Is that what you
20  mean?
21  A   Well, I can't remember actually if I put it in
22  the closet. Like I put it up in my house, yeah, at the
23  time.
24  Q   Well, I've got to ask you that then. So other
25  than the closet, where would you store money in your

**Page 31**

1   house?
2   A   That's -- my grandma's room, up under her bed or
3   the closet. The closet is where I majority kept it at.
4   Q   Now, the closet --
5   A   See, that's why I say, I can't remember because
6   I might have had put it under my grandma's bed at the
7   time. I can't remember where I went in the house and
8   put it up, but I know it was in the house. But when I
9   was going up to Georgia, we was going to Atlanta, it
10  was in -- everything was in my room in my closet.
11  Q   So you would store money in your grandmother's
12  house in a closet?
13  A   Yes, sir.
14  Q   And then you'd also store it under the bed;
15  correct?
16  A   Yes, sir.
17  Q   Your grandmother's bed; correct?
18  A   Yes, sir.
19  Q   Any other places you would store the currency?
20  A   No. That's it.
21  Q   Mr. Durr, let me ask you a couple of questions.
22  Has your grandmother's house ever been robbed?
23  A   Yes, sir.
24  Q   Presumably that was before you started storing
25  currency though; right?

**Page 32**

1   A   No.
2   Q   They just didn't find the currency?
3   A   They just -- they -- no, sir, they didn't find
4   it.
5   Q   Now, if money is stolen from your grandmother's
6   house, who's going to find it and bring it back to you?
7   A   What you mean?
8   MR. FOWLER:   Object to form.
9   THE WITNESS:  A   Find and bring it back?
10  MR. BENNETT:  Q   Yeah. In other words, if
11  money's stolen from a house, who's going to be in
12  charge of looking for it and getting it back to you?
13  A   Well, the way they broke in, they didn't -- they
14  broke in, they didn't ever get nothing.
15  Q   What I'm getting at is do you think there are
16  safer places to store currency?
17  A   Well, actually, where my grandma stay, it's like
18  four houses on that street and stay off like in the
19  woods like, so I just wouldn't think nobody will come
20  in and break in a house like that.
21  Q   Okay. Let me ask you this: If a bank is robbed
22  and you have an account there, do you lose your money?
23  MR. FOWLER:   Object to form.
24  THE WITNESS:  A   That's what I always heard. I
25  mean I -- I mean I really don't know really. I don't

**Page 33**

```
 1  know, unless you've got insurance on your money, I
 2  guess.  I really don't know.
 3      MR. BENNETT:  Q    Did it ever occur to you that it
 4  might not be a safe thing to do, to transport $20,000
 5  or $21,000 in cash up to Atlanta?
 6      MR. FOWLER:    Object to form.
 7      THE WITNESS:  A    Well, I know it wasn't safe at
 8  my house, if I'm not there because it got broken into
 9  and I just -- yes, sir, that's why I took it all with
10  me.
11      MR. BENNETT:  Q    What exactly were you going to
12  do with the $21,000 in Atlanta?
13      A    I was going get the house and see how much it
14  was, it cost to get the houses out of foreclosure, my
15  house, my dad's house and my grandma's house and also
16  repair the houses.
17      Q    Who were you going to meet with?
18      A    Bank of America.
19      Q    On what day?
20      A    Monday.
21      Q    What did you plan to do with the $21,000?
22      A    I mean, like I say, repair the houses and get
23  the houses out -- whatever it cost to get the houses
24  out of foreclosure.  I was going to pay on that,
25  whatever -- for me and my parents and my grandmamma and
```

**Page 34**

```
 1  dad.
 2      Q    Who had you talked with -- had you talked with
 3  anyone at Bank of America prior to heading for Atlanta?
 4      A    Yes, I had some phone calls and they said the
 5  branch was in Atlanta, but like I say, Jerry's from
 6  Atlanta and I didn't -- I'm not familiar with Atlanta,
 7  so I was going to go in and talk to them and give them
 8  my name, like I say, and my Social Security number and,
 9  you know, just tell them who I am and what I was there
10  for.
11      Q    And take the plastic bag with $21,000 and put it
12  on the desk; is that right?
13      MR. FOWLER:    Object to form.
14      THE WITNESS:  A    I don't think -- I wasn't going
15  to do it like -- I don't know, I was -- I mean I know
16  it was legit, so I mean I just wasn't going --
17      MR. BENNETT:  Q    That's what I'm trying to
18  understand.  What I'm trying to understand is why you
19  would take $21,000 in cash and travel to Atlanta and
20  what business you expected to conduct with the bank?
21      MR. FOWLER:    Object to form.
22      THE WITNESS:  A    To get the houses out of
23  foreclosure.
24      MR. BENNETT:  Q    Did you have an appointment at
25  the bank on Monday?
```

**Page 35**

```
 1      A    No, sir, I didn't have an appointment.
 2      Q    This $21,000, is this your life savings?
 3      A    What you mean, as far as?
 4      Q    I mean do you have any other money, besides --
 5  saved anywhere, besides this $21,000?
 6      MR. FOWLER:    Object to form.
 7      THE WITNESS:  A    No.  No, sir.
 8      MR. BENNETT:  Q    No 401(k)?
 9      A    I don't have that.
10      Q    No additional savings account anywhere?
11      A    No, sir.
12      Q    So this is the only money that you had saved and
13  accumulated in your entire life; is that correct?
14      A    Yes, sir.
15      Q    And you took your life savings and put it in a
16  plastic bag; is that correct?
17      A    Yes, sir.
18      Q    And drove it up to Atlanta?
19      A    Yes, sir.
20      Q    And you also purchased rubber bands; is that
21  correct?
22      A    I may have had the rubber bands for years.  I
23  mean, you know, from buying like Dollar General before
24  -- when I was accumulating the money.  I'm sorry.  I
25  got them at Dollar General, yeah.
```

**Page 36**

```
 1      Q    Why did you decide to put it in a thousand
 2  dollar increments?
 3      A    That's just something -- I just -- I don't know.
 4  Just really don't know.
 5      Q    When the law enforcement officer asked you and
 6  Mr. Lett whose money it is, did you immediately say
 7  it's mine?
 8      A    Yeah.  Before I got a chance to say something,
 9  Jerry had pointed to me anyway and said it was mine,
10  but I was going to tell him it was mine.
11      Q    Now, do you remember if you responded the first
12  time the officer asked whose money it is?
13      A    I can't remember.  I probably did.  I mean I
14  didn't have no reason not to.
15      Q    Because you'd agree that's not a complicated
16  question, who owns the money; right?
17      A    Right.  Right.
18      Q    Do you recall telling the officer that the money
19  belonged to you, your father and your grandmother?
20      A    What I meant -- yes, sir.  What I meant was that
21  I was going to take care of the houses for us and
22  repair the houses.  Yes, sir.
23      Q    Is it true that you own a house up in Atlanta?
24      A    Yeah.
25      Q    How did you come to own that house?
```

**Page 37**

1  A   My step-mom's brother, Ron, that stays in
2  Atlanta, he had said he had a business proposition for
3  about nine of us and we all purchase the houses.
4  Q   Do you know who Alicia Burnett is?
5  A   Uh-uh. What did they say? I mean who is that?
6  Q   I was hoping you know, because -- and did you
7  purchase a house from her?
8  A   No.
9  Q   Who had the house before you bought it; do you
10 know?
11 A   No.
12 Q   Now, tell me a a little bit about these houses
13 that you've got.
14     MR. FOWLER:   Object to form.
15     MR. BENNETT:  Which part? I haven't
16 asked the question yet.
17     MR. FOWLER:   Well, you made a statement,
18 the houses he's got. He never claimed he owned
19 more than one house.
20     MR. BENNETT:  All right.
21 MR. BENNETT: Q   Do you own a house in Atlanta?
22 A   Yes, sir.
23 Q   Do any of your relatives own houses in Atlanta?
24 A   Yes, sir.
25 Q   The money was intended to see about foreclosures

**Page 38**

1  on which properties?
2  A   My grandma, my dad, and mine.
3  Q   When did you buy your house?
4  A   2007, I think.
5  Q   When did your dad buy his house?
6  A   Everybody 2007.
7  Q   So there are three houses total; is that
8  correct?
9  A   Yeah.
10 Q   And the money that you were traveling with was
11 intended to get all three houses out of foreclosure; is
12 that correct?
13 A   Yes, sir.
14 Q   What kind of shape are these houses in?
15 A   Real bad shape.
16 Q   How much did you pay for the house that you
17 have?
18 A   64,000 -- 64 or 68,000.
19 Q   And you paid 68,000 and that's the pictures that
20 you sent to us in response to discovery; is that right?
21 A   Yes, sir.
22 Q   Do you know how much those houses are worth
23 right now?
24 A   No, sure don't.
25 Q   Is it less than 68,000?

**Page 39**

1  A   I don't know.
2      MR. BENNETT:  Just give me one second,
3  please. That's it.
4  (DEPOSITION CONCLUDED 1:50 P.M.)
5  --------------------------------------------------------
6            CERTIFICATE OF REPORTER
7  GEORGIA, MONROE COUNTY
8      I, Sarah Peters, Georgia Certified Court Reporter
9  2775, CERTIFY that acting in such capacity on December
10 20, 2011, I reported the testimony of TERRANCE DURR,
11 and on the foregoing pages, numbered 3 through 39, both
12 inclusive, have transcribed or have had transcribed an
13 accurate account of such testimony.
14     I FURTHER CERTIFY that I am not counsel for nor
15 related to any of the parties; nor am I interested in
16 the event or outcome thereof.
17     WITNESS MY OFFICIAL SEAL and signature, this the
18 5 day of JANUARY, 2012.

                    _____
                    Georgia Certified Reporter 2775