## Page 1

```
            IN THE UNITED STATE DISTRICT COURT FOR THE
                      MIDDLE DISTRICT OF GEORGIA
                           COLUMBUS DIVISION

UNITED STATES OF AMERICA,    :
                             :
     Plaintiff,              :
                             :
     vs.                     :   CIVIL ACTION
                             :   NO. 4:11-CV-38(CDL)
21,175.00 IN UNITED STATES   :
FUNDS,                       :
                             :
     Defendant.              :
                             :
-----------------------------
```

COLUMBUS, GEORGIA   2:15 P.M.   DECEMBER 20, 2011

The deposition of **DREW CRANE** is being taken by the Defendant; testimony is being given before Sarah Peters, Georgia Certified Court Reporter 2775, in the offices of U.S. Attorney's Office on December 20, 2011, beginning at approximately 2:15 p.m.

---

APPEARANCES:

For the Plaintiff:    MR. DANIEL BENNETT
                      U.S. Attorney's Office
                      300 Mulberry Street, 4th Floor
                      Macon, Georgia    31201

For the Defendant:    MR. DUSTIN J. FOWLER
                      185 North Oates Street
                      Dothan, Alabama    36301

Also Present:  Terrance Durr
               Ellie Parker

## Page 2

DISCLOSURE

STATE OF GEORGIA        Deposition of: DREW CRANE
COUNTY OF BIBB:         Date: December 20, 2011

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter and ma here as a representative of Court Reporting Associates, Inc.

I am not disqualified for a relationship of interest under the provisions of O.C.G.A. §9-11-28(c).

Court Reporting Associates, Inc., was contacted by the offices of U.S. Attorney's Office to provide court-reporting services for this deposition.

Court Reporting Associates, Inc., will not be talking this deposition under any contract that is prohibited by O.C.G.A. §15-14-37 (a) and (b).

Court Reporting Associates, Inc., has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Court Reporting Associates, Inc., will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____
Sarah Peters, GCCR 2775

## Page 3

STIPULATIONS:

MR. FOWLER:   Usual stipulations for the record.

(REPORTER'S NOTE:   The witness WAIVES the right to read and sign the completed transcript of the deposition.)

(The Exhibit, Defendant's A is obtained by Mr. Bennett, which is attached to the deposition Terrance Durr)

---

**DREW CRANE**

having first been duly sworn by the court reporter, testified on

**EXAMINATION**

BY MR. FOWLER:

Q   Could you state your full name, Deputy Crane?
A   Drew Crane.
Q   What's your middle name?
A   Nathan.
Q   Where are you currently employed?
A   Harris County.
Q   Sheriff's Department or Police Department?
A   Sheriff's office.
Q   How long have you been there?
A   Since August of 2010.

## Page 4

Q   Okay. Where were you before that?
A   Forsyth Police Department.
Q   I couldn't hear you.
A   Forsyth Police Department.
Q   How long were you there?
A   It would be hard to say to be quite honest with you.
Q   Best guess, approximation.
A   Two years, three years.
Q   Why did you leave Forsyth?
A   I went to go work overseas contracts.
Q   Okay. How long have you been in law enforcement?
A   Total, between military and civilian, since 1991, December the 29th.
Q   What was your rank in the military, highest rank?
A   E-4.
Q   How many years you serve in the military?
A   Five and a half.
Q   From what time period?
A   Well, since 1991 until when I got out in -- let's see. Five and a half years from there. What was that? '96, I think so.
Q   From '96 to 2011, you've been involved in law

**Page 5**

1 enforcement?
2  A  Uh-huh.
3  Q  She can't get uh-huh. Let me just say, answer my questions yes and no because for the court reporter, she's not going to be able to get uh-huh. Is that
6 okay?
7  A  That's fine.
8  Q  Okay. What law enforcement agency did you draft
9 in '96?
10  A  Lamar County Sheriff's Office.
11  Q  And after that?
12  A  Let's see. I took a leave of absence to take
13 care of my mother and I had to -- I gained employment
14 again with the Griffin Police Department.
15  Q  Have you ever been fired from a police
16 department?
17  A  No.
18  Q  Or from a sheriff's department?
19  A  No.
20  Q  Ever resigned?
21  A  Each time I left each department.
22  Q  On your own terms?
23  A  Yes.
24  Q  Now, as you're training in law enforcement, how
25 many narcotic seminars have you been to?

**Page 6**

1  A  Oh, shoot. That would be -- I couldn't count
2 the numbers.
3  Q  Did you go to one in 2010?
4  A  I don't think so. Maybe 2009. It was when --
5 let's see. The last seminar I went to was at the
6 Federal Building in Macon.
7  Q  Was that narcotics?
8  A  What was the seminar that was given by the DEA,
9 I think the U.S. Attorney's Office sponsored it?
10  Q  What were the topics covered there?
11  A  Anything that had to do with drug interdiction.
12  Q  Only drug interdiction, was that the cause?
13  A  Sir, that's been quite sometime.
14  Q  I understand. Just best guess.
15  A  Are you asking me to speculate?
16  Q  I'm not asking you to speculate, I'm asking you
17 the truth. What were the topics there? If you don't
18 know, say you don't know.
19  A  Other than drug interdiction, narcotics,
20 basically it.
21  Q  Do you have any specialized training or
22 certifications in narcotics?
23  A  Such as?
24  Q  Any specialized training in -- do you receive
25 any certificates?

**Page 7**

1  A  Sure, I've been Desert Snow Level's 1 through, I
2 believe it's 4. My K-9, I've been K-9 right at nine
3 years.
4  Q  Nine years?
5  A  Yeah, right at.
6  Q  So do you have certification certificates
7 regarding drug narcotics?
8  A  Regarding?
9  Q  I went to a class.
10  A  Correct.
11  Q  A drug training, I got a certificate.
12  A  Correct.
13  Q  You do have those?
14  A  Correct.
15  Q  Where are they from?
16  A  Everything from the Forsyth Academy to Desert
17 Snow, U.S. Attorney's Office, K-9 certifications
18 through Jack Robicheaux K-9 concepts in Louisiana.
19  Q  Where'd you get trained with your K-9 at?
20  A  Jack Robicheaux K-9 concepts in Louisiana, that
21 would be Broussard, Louisiana as a matter of fact.
22  Q  How many weeks or days were you down there?
23  A  I think it was three weeks.
24  Q  How many K-9's have you had while you've worked
25 at Harris County?

**Page 8**

1  A  Oh, none. I'm not K-9 there.
2  Q  Why?
3  A  They only have one position and besides that, my
4 dog died.
5  Q  Deputy Harris (sic), did you come in contact on
6 or about October 30th with a Terrance Durr and Jerry
7 Lett in Harris County out in Georgia?
8  A  Well, sir, my name is Deputy Crane.
9  Q  Deputy Crane, I'm sorry.
10  A  And I don't even know who you are, sir.
11  Q  I'm his attorney, Dustin Fowler.
12  A  Okay.
13  Q  Did you come in contact with Jerry Lett and
14 Terrance Durr on or about October 30th, 2010 on
15 Interstate 185 in Hamilton, Harris County, Georgia,
16 sir?
17  A  Yes, sir.
18  Q  Why did you pull them over?
19  A  For a tag light violation and also, failure to
20 maintain lane.
21  Q  You didn't write them a ticket, did you?
22  A  I wrote them a warning citation.
23  Q  How many of those identical citations have you
24 given since you've worked for Harris County?
25  A  Oh, shoot.

**Page 9**

          MR. BENNETT:    Object to the question.
          MR. FOWLER:    That's fine.
     MR. FOWLER: Q    You can answer.
     A    He just objected to the question.
          MR. BENNETT:    No, you can answer, if you know.
     THE WITNESS: A    Several hundred
     MR. FOWLER: Q    So you've given several hundred -- let me make sure I'm correct on this. I'm not asking tickets in general. I'm asking, you've given several hundred failure to maintain and a burnout tag light for Harris County?
     A    Tag lights.
     Q    So you've given several hundred tag lights?
     A    Several. It sounds like you're saying seven hundred.
     Q    Several hundred?
     A    Several.
     Q    Best guess?
     A    I'm not going to guess.
     Q    Over a hundred?
     A    Yes, sir.
     Q    Over 200?
     A    I'm not going to guess.
     Q    Okay. You can say I don't know. I'm not asking

**Page 10**

you to guess. To your best of your knowledge, have you given out over 200?
     A    To the best of my knowledge, I'm not going to guess.
          MR. FOWLER:    I think I'm going to stop here and I'm going to go to a Federal Court. He can say he doesn't know but he cannot say I'm not going to guess. It's nonresponsive.
          MR. BENNETT:    Do you really think that that exchange merits the time of the Federal Judge?
          MR. FOWLER:    Well, I mean, I don't have an option if it's an combative witness.
          MR. BENNETT:    I will state for the record, I don't think that anyone is anywhere near combative. You're simply attempting to get some background information.
          MR. FOWLER:    Just like you did in your's and Mr. Durr.
          MR. BENNETT:    You're right, and I would put on the record emphatically that we're nowhere near the stratosphere where a Federal Judge needs to be disturbed. How about we do this: Can I provide an instruction and you can provide a clarification?

**Page 11**

          MR. FOWLER:    Okay.
          MR. BENNETT:    If he asked you a question, for which you do not know an answer and you were being asked to approximate, in your answer, you can say I do not know the number for certain but I will approximate it to be this. If he asks you a question that you do not know the answer to, say I do not know the answer. And if you don't know the answer, then that should be the end of it. Does that suit you, Mr. Fowler?
          MR. FOWLER:    That is fine.
          MR. BENNETT:    No need for a Federal Judge then. Let's move on.
     MR. FOWLER: Q    Over 200?
          MR. BENNETT:    Could you rephrase?
          MR. FOWLER:    I'll rephrase.
          MR. BENNETT:    Thank you.
     MR. FOWLER: Q    Have you given over 200 warnings or traffic citations for failure to maintain lanes pursuit to O.C.G.A 40-6-48 and a burnout tag light pursuit to O.C.G.A 40-8-23D
          MR. BENNETT:    Object to the form of the question. You may answer.
     THE WITNESS: A    I believe that to be fair, sir.

**Page 12**

     MR. FOWLER: Q    Now, on everyone of these tickets that you gave, failure to maintain lane, do you ask permission to search the car for everyone of them?
     A    No, sir.
     Q    For every ticket that you've ever given for a burnout tag light, do you ask the passengers or the driver to search their car?
     A    Only if I believe that criminal activity is at foot, sir.
     Q    So is that no, you don't ask every one of them?
     A    No, sir.
     Q    Okay. Why did you ask this time?
     A    Because I believe criminal activity was at foot.
     Q    What criminal activity?
     A    The odor of marijuana emitting from the vehicle. The odor of alcohol emitting from the vehicle while I was conducting business up there, obtaining driver's license and insurance and explaining the reason for the stop.
     Q    Did you find any marijuana?
     A    No, sir.
     Q    You didn't find any seeds?
     A    No, sir.
     Q    Did you find any open containers?
     A    No, sir.

## Page 13

1  Q  Okay. Did you find any illegal narcotics in
2  there?
3  A  No, sir.
4  Q  Did you find any illegal narcotics on Jerry
5  Lett?
6  A  No, sir.
7  Q  Did you find any illegal narcotics on Mr. Durr?
8  A  No, sir.
9  Q  Now, did you believe that Mr. Lett had been
10 drinking based on the smell of alcohol and marijuana?
11 A  Once I got Mr. Lett out of the vehicle, I did
12 not smell alcohol emitting from this person.
13 Q  You didn't administer any field sobriety test,
14 did you?
15 A  As far as standardized, no. Did I talk to them
16 on the roadside to make sure he was okay to drive, yes,
17 I did.
18 Q  And then are you familiar with the National
19 Highway Traffic Safety Administration of Sobriety Test?
20 A  I am.
21 Q  Okay. That's not a formal test given in there,
22 is it, that would constitute a field sobriety test, is
23 it?
24 A  If you look at NHTSA as a whole, there are
25 multitudes of test in which you can go into, not just

## Page 14

1  the three standardized that they have provided.
2  Q  Was talking to someone on the road a test?
3  A  What it simply does is I'm trying to see whether
4  or not the driver is okay to continue with his trip.
5  Q  I'm going to ask you again, is that test in
6  NHTSA?
7  A  Is that test in NHTSA? As far as the three
8  standardized --
9  Q  No, talking beside the road, is that in NHTSA?
10 A  If you characterize it as talking, they do have
11 to count.
12 Q  I understand.
13 A  So you're characterizing it as talking, then
14 yes.
15 Q  Is it considered a field sobriety test pursuit
16 to NHTSA?
17 A  I would say no.
18 Q  Thank you. So let me make sure I get this
19 right. You conducted no sobriety test -- field
20 sobriety test that are recognized by NHTSA; is that
21 correct?
22     MR. BENNETT:  Object to the form of the
23 question, with regard to whom? Whom are we
24 talking --
25     MR. FOWLER:  To Jerry Lett.

## Page 15

1      THE WITNESS: A  Can you say it again, sir?
2      MR. FOWLER: Q  You conducted no field sobriety
3  test as stated by NHTSA to Jerry Lett; is that correct?
4  A  Correct.
5  Q  Thank you. Did you come in contact with a Mr.
6  Terrance Durr on that occasion?
7  A  I did.
8  Q  Did you ask Mr. Durr out of his vehicle?
9  A  I did.
10 Q  Did you ask to search Mr. Durr?
11 A  I'm sorry, that was not Mr. Durr's vehicle, I'm
12 sorry.
13 Q  When you exited him out of the vehicle, did you
14 ask Mr. Durr to be -- to search him?
15 A  Yes.
16 Q  He gave you consent?
17 A  Yes.
18 Q  What did you find on Mr. Durr?
19 A  A large bundle of money.
20 Q  How much?
21 A  I had him count it out there on the roadside, so
22 on the video, I forget what he said, but I wanted to
23 make sure what he had on this person is what he had.
24 Q  Did you find money on him?
25 A  Well, yes, the bundle of money, I believe was

## Page 16

1  the left front pocket.
2  Q  Now, I'm not familiar with Georgia law so bare
3  with me on this. Is it illegal to carry cash on you in
4  Georgia?
5  A  No.
6  Q  Did you find anymore money in the car?
7  A  I did.
8  Q  How much did you find and where?
9  A  $21,175.00 located underneath the front
10 passenger seat.
11 Q  Again, I'm not familiar with Georgia law, is it
12 illegal to carry over $21,000 in the state of Georgia?
13 A  No, sir.
14 Q  Would you agree with me, it's not illegal to
15 carry it anywhere in the United States?
16 A  I wouldn't be able to answer that question based
17 on the other 49 states.
18 Q  I can live with that answer. Okay. I'm going
19 to show you what I will mark as Defendant A. I'm going
20 to give you a chance to review that.
21     MR. BENNETT:  Could we clarify for the
22 record he's looking at the Government's
23 Verified Complainant for Forfeiture Document
24 No. 1; is that correct, sir?
25     THE WITNESS:  Yes.

**Page 17**

1  MR. FOWLER:  I was going to give him a
2  chance to view it first.
3  MR. BENNETT:  I just wanted to make sure
4  I knew what we were talking about.  Now, is
5  there a question there?
6  MR. FOWLER:  Yes, as soon as he says
7  he's reviewed it.
8  THE WITNESS:  It's going to take a
9  minute, sir.
10  MR. FOWLER:  That's fine.
11  THE WITNESS:  If you want to go ahead
12  with your question, sir.
13  MR. FOWLER:  Q  Well, my first question is, have
14  you seen that before today?
15  A  No, sir.
16  Q  You've never reviewed it with the U.S.
17  Attorney's Office?
18  MR. BENNETT:  Object to the question.
19  MR. FOWLER:  Q  Have you ever reviewed it with
20  Assistant United States Attorney, Daniel Bennett, that
21  document?
22  A  No, sir.
23  Q  Did you relay anything of that document to
24  Assistant United States Attorney, Daniel Bennett?
25  A  Well, that would probably be consistent with my

**Page 18**

1  report in this case file.
2  Q  I understand.  Did you ever talk to him about
3  that complaint?
4  A  Mr. Bennett?
5  Q  Uh-huh.
6  A  No.
7  Q  So you had no idea this was filed, this
8  complaint?
9  A  When you speak of complaint, what --
10  Q  I will --
11  A  I'm sorry.  I'm not an attorney.
12  Q  The verified complaint for forfeiture, you had
13  no idea that's been filed in this matter?
14  A  I was contacted I'm sure by the U.S. Attorney's
15  Office but not by Mr. Bennett.
16  Q  When were you contacted by the U.S. Attorney's
17  Office?
18  A  Well, sir, I couldn't tell you.
19  Q  Who were you contacted by?
20  A  It was probably either Ms. Martha or -- I can't
21  say the other lady's name, there at the U.S. Attorney's
22  Office.
23  Q  So you don't know for sure who you talked to at
24  the U.S. Attorney's Office?
25  A  Well, Ms. Martha.  I've been -- yes, Ms. Martha

**Page 19**

1  for sure.
2  Q  You talked to her about this complaint?
3  A  That we had a hearing scheduled or a deposition.
4  Q  Did you talk to her before April 13th, 2011?
5  A  Shoot, I couldn't tell.
6  Q  You talked to Mr. Bennett before April 13th,
7  2011 about this case?
8  MR. BENNETT:  Object to the question.
9  You're asking this witness to talk about
10  conversations with counsel from the government.
11  I'm not sure the basis for asking that
12  question.
13  MR. FOWLER:  Well, I'm not sure that
14  there's a privilege there.  I mean, because
15  technically as I was told by Ms. Walbert, I had
16  to issue him a subpoena because he was a
17  nonparty.  So if he's not a party, how would
18  you have any privilege?
19  MR. BENNETT:  Not sure I know either, go
20  ahead.
21  MR. FOWLER:  Q  What conversation did you have
22  with the U.S. Attorney, Daniel Bennett about this case?
23  A  I haven't had a conversation with the man.
24  Q  So you've never spoke to him about this case?
25  A  No.

**Page 20**

1  Q  Okay.  Not even a brief phone call?
2  A  No, sir.
3  Q  Now, what do you contend that these are illegal
4  proceeds, the money seized, the 21,175.00?
5  MR. BENNETT:  Object to the form of the
6  question.
7  THE WITNESS:  Can I still answer that
8  or --
9  MR. BENNETT:  Yes, you can answer.
10  THE WITNESS:  A  Ask your question again, sir.
11  MR. FOWLER:  Q  Did you seize money from Mr. Durr
12  that day?
13  A  I did.
14  Q  Do you realize this money has been seized by the
15  United States of America?
16  A  I do.
17  Q  Do you contend that these are illegal proceeds?
18  A  I do.
19  Q  What knowledge and why are these -- is the
20  21,175.00 illegal proceeds?
21  A  What knowledge and why?  Well, A, you've got
22  felons of feather flocked together.  You've got Mr.
23  Durr and Mr. Lett, both of them have extensive
24  histories in drug transactions.  On top of that, the
25  money itself is packaged, which is consistent with drug

**Page 21**

1  funds or drug proceeds.
2  Q   Only those two reasons?
3  A   I would say also that in my career, I've never ever come in contact with anybody that carries that kind of currency on them, unless they're engaged in some type of criminal activity. John Q, which is the -- how do I say this -- the innocent motor in public, when they go and withdraw funds from a bank, they go up there, you fill out a piece of paper, transaction is conducted there at the bank and you are given a withdraw slip when you leave that bank. That's where I keep my money in the bank. You keep your money in the bank, sir?
14 Q   Son, I'm not given where I keep all my money. I'm just going to let that be. I'm not the one on a deposition here. Now, do you know when the history of Mr. Durr and Mr. Lett occurred?
18 A   If it's so extensive, sir, I couldn't give you the dates. You're asking for specifics and I wish I could tell you the specifics on their criminal histories but, however, again, you're talking about a Sears Roebuck catalog for both of them.
23 Q   So you don't know when their last date of arrest for drug transaction was; is that correct?
25 A   I know that Mr. Durr has had some contact with

**Page 22**

1  some very special individuals.
2  Q   And we understand that. Again, yes or no?
3  A   I'm sorry?
4  Q   You do not know when his last date of his drug arrest was, do you?
6  A   I could not state specifically what date, no, sir.
8  Q   You did not know it at the time you seized his money, did you?
10 A   No, sir.
11 Q   Okay. When was the last day Mr. Lett was arrested for drug transactions?
13 A   I couldn't give you a specific date, sir.
14 Q   You didn't know that when you seized their money, did you?
16 A   No, sir.
17 Q   Now, again, you stated for the record under oath that you've contended that this money is illegal proceeds; correct?
20 A   I do.
21 Q   What date did Mr. Durr receive these illegal proceeds?
23 A   I don't know.
24 Q   What alleged illegal substance and/or chemical was made the basis of the transaction for these illegal

**Page 23**

1  proceeds?
2  A   I'm sorry?
3  Q   I'll break it down to you as simple as I can. I may get an objection. I'll reform. What drug do you contend that this money originated from?
6  A   I couldn't tell you which drug.
7  Q   So it's safe to say you have no idea what drug this money was proceeds from?
9  A   Well, those are your words, sir.
10 Q   Do you agree or disagree with my words?
11 A   I have no idea about which drug that came from.
12 Q   Where were they going in Atlanta?
13 A   We have Mr. Lett saying Sandy Springs and you had Mr. Durr saying they were going to the City of Atlanta, downtown.
16 Q   Would you agree with me Atlanta is a big place?
17    MR. BENNETT:   Objection to the question.
19    MR. FOWLER: Q   Would you agree with me, Atlanta has more than a million people?
21 A   I have never got a sensus on Atlanta.
22 Q   Would you agree with me that Atlanta is bigger than Columbus?
24 A   Sure.
25 Q   Would you agree with me that Fulton County is

**Page 24**

1  bigger than Harris County?
2  A   I don't know. That's awfully a small county there.
4  Q   It's got the City of Atlanta in it.
5  A   Yeah, but Harris is 495 square miles I believe and Fulton just, I mean, if you look on the state map there, just sizes on the map --
8  Q   Rephrase my question. Would you agree with me the population of Fulton County is greater than --
10 A   Density, correct.
11 Q   So would you agree with the statement, there's a lot of places you could go in Atlanta?
13    MR. BENNETT:   Object to the question.
14    THE WITNESS:  A   Any place, sure.
15    MR. FOWLER: Q   Would you agree with me it's not illegal to go to Atlanta?
17 A   Sure.
18 Q   Would you agree with me it's not illegal to go to Sandy Springs?
20 A   Yes.
21 Q   Have you ever been involved in any asset forfeiture before?
23 A   Correct.
24 Q   Federal or State or both?
25 A   I believe both.

## Page 25

1  Q   Name me the last Federal forfeiture that you
2  were involved in.
3  A   There, again, you're asking for a date and I
4  couldn't tell you.
5  Q   Approximation of the date of the last Federal
6  forfeiture.
7       MR. BENNETT:   If you know.
8       MR. FOWLER: Q   If you know.
9  A   I couldn't tell you, sir.
10 Q   Name me one that you've ever been involved in,
11 Federal forfeiture from any point in time, ever?
12 A   You're asking for a date, sir?
13 Q   No, any year.
14 A   Maybe like 2002.
15 Q   Who did you seize the money from?
16 A   I have no idea, sir.
17 Q   Were you the one that actually seized the money?
18 A   Yes, sir.
19 Q   Was the person you seized it from
20 African-American?
21 A   I don't know.  I've had both.
22 Q   I didn't ask you that.  The one that you said in
23 2002 that you conducted --
24 A   I couldn't tell you, sir.  You're asking for a
25 specific, sir, and I cannot give you specifics on

## Page 26

1  dates.
2  Q   Do you remember the Federal asset forfeiture in
3  2002?
4  A   I'm just spit balling at what year I'm coming up
5  with.
6  Q   Have you been involved in any forfeiture for
7  Harris County for the State, County of Harris, State of
8  Georgia?
9  A   This one right here.
10 Q   This the only one?
11 A   Uh-huh.
12 Q   Have you ever stopped anybody with money before
13 while working at Harris County?
14 A   No, sir.
15 Q   So this was your first asset forfeiture for
16 Harris County?
17 A   Yes, sir.
18      MR. BENNETT:   The terms asset forfeiture
19      and seizure are being used interchangeably.  Do
20      you mean to?  I'm not sure if you mean to.
21      MR. FOWLER:   Well, I can rephrase.
22      MR. FOWLER: Q   Is this the first time you've
23 ever seized United States' currency while you worked at
24 Harris County?
25 A   Yes, sir.

## Page 27

1  Q   Have you ever seized vehicles while you worked
2  at Harris County?
3  A   Yes, sir.
4  Q   When did you seize vehicles?
5  A   Sir, I couldn't tell you a date.  I would love
6  to tell you a date, I just don't have that.  I'm sorry,
7  I can't recall that.
8  Q   Were some of the people you seized vehicles from
9  African-American?
10 A   No.
11 Q   So they were all Caucasian?
12 A   With Harris County, yes.
13 Q   Were drugs found in those vehicles?
14 A   I believe so.
15 Q   But you didn't find any drugs on Mr. Lett or Mr.
16 Durr; correct?
17 A   Correct.
18 Q   But you seized their money either way; correct?
19 A   Correct.
20 Q   Do you know if Mr. Durr was asleep or not before
21 you pulled Mr. Lett over?
22 A   He acted like he pretended to be asleep when I
23 walked up there.
24 Q   But you don't know for sure if he was asleep or
25 if he was pretending to be asleep, do you?

## Page 28

1  A   If you're asking me whether or not I'm a mind
2  reader, no.
3  Q   Are you aware of what the word drug
4  paraphernalia means?
5       MR. BENNETT:   Which word?
6       MR. FOWLER:   Drug paraphernalia.
7       MR. FOWLER: Q   Are you aware of the term drug
8  paraphernalia?  I'll rephrase.
9  A   Okay.  Yes.
10 Q   Have you had experience in training with drug
11 paraphernalia in your course of law enforcement?
12 A   Experience, sure.
13 Q   What's your definition of drug paraphernalia as
14 a law enforcement officer?
15 A   Drug related object.
16 Q   Did you find that in the car with Mr. Lett and
17 Mr. Durr were riding in?
18 A   I did not.
19 Q   Did you find drug paraphernalia, according to
20 your terms, on Mr. Durr or Mr. Lett?
21 A   I did not.
22 Q   Did you find any narcotics on the actual
23 currency?
24 A   No, sir.
25 Q   Did you find any illegal substance on the actual

**Page 29**

1  currency?
2  A  No, sir.
3  Q  Did you ask Mr. Durr for his ID?
4  A  Yes, sir.
5  Q  Mr. Durr give you his ID?
6  A  I don't think he had an ID out there at the
7  time.
8  Q  Okay. Is it illegal not to have an ID in the
9  state of Georgia?
10 A  No, sir.
11 Q  Now, you're familiar with his criminal history.
12 Are you aware that Mr. Durr had a DUI, had his license
13 suspended in 2010?
14 A  I'm not. Did he?
15 Q  Yes. And would you agree with me that in the
16 state of Georgia, if your license is suspended in
17 Alabama, you cannot drive in the state of Georgia,
18 would you agree with that?
19 A  Sure.
20 Q  So you would agree about Mr. Durr not driving
21 the car, he was obeying the law; correct?
22 A  When you ask that question and you're saying
23 obeying the law, I'm just trying to clarify here.
24 Q  Okay.
25 A  When you ask that question obeying the law, are

**Page 30**

1  you simply asking me, he was not driving the vehicle?
2  And no, he was not driving the vehicle, which would not
3  be a violation of driving while license is suspended.
4  Q  So you would agree by him not driving with no
5  license, he was obeying the law; correct?
6  A  Driving while license suspended, correct.
7  Q  What personal knowledge do you have that Mr.
8  Durr was violating any Federal and/or Georgia State
9  law?
10 A  During which periods?
11 Q  When you pulled him over.
12 A  You're asking me at the time?
13 Q  At the time.
14 A  None at that time.
15 Q  Yet you still seized his money even though he
16 was in violation of no State Georgia law and/or Federal
17 law; correct?
18 A  Correct.
19 Q  Now, how much portion of the 21,175, if you
20 know, will the Harris County Sheriff's Department
21 receive?
22 A  Usually there's a percentage. And the
23 percentage, I couldn't tell you. You probably know it
24 better than I do.
25 Q  But you would agree that you will receive a

**Page 31**

1  percentage of this if this is successful?
2  A  Sure.
3  MR. BENNETT:  Object to the form of the
4  question. He's not -- you're suggesting that
5  Deputy Crane, himself -- when you say you, do
6  you mean --
7  MR. FOWLER:  Okay. I'll rephrase.
8  MR. FOWLER: Q  You would agree with me that
9  Harris County, Georgia Sheriff's Department will
10 receive a percentage of the $21,175 --
11 A  Yes.
12 Q  And that money goes to benefit the Harris
13 County, Georgia Sheriff's Department's police force;
14 correct?
15 A  I don't know if it benefits it. You know, I
16 don't have a say as to where it goes.
17 Q  But you will agree it will go to your
18 department?
19 A  Yes.
20 Q  When's the last State Georgia forfeiture that
21 you were involved in?
22 A  It would be this one.
23 Q  Besides this one.
24 A  I couldn't tell you which year.
25 Q  Is it safe to assume you do not have a great

**Page 32**

1  deal of experience in asset forfeitures, Federal or
2  State law?
3  MR. BENNETT:  Object to the question.
4  THE WITNESS: A  No, I wouldn't say it was safe.
5  MR. FOWLER: Q  So you have a lot of experience?
6  A  I didn't say that either.
7  Q  So you're a novus at it, at asset forfeiture?
8  A  Are you saying novus?
9  Q  Or novus, I've heard it pronounced both ways.
10 A  What would be your opinion of somebody that
11 would be experienced in it?
12 Q  A definition, you're not a rookie, but you're
13 not a veteran.
14 A  That's fair.
15 Q  Now, before this one, do you usually present
16 these to the Harris County District's Attorney Office
17 and/or prosecutor's office?
18 MR. BENNETT:  Object to the form of the
19 question. Who is you?
20 MR. FOWLER: Q  Would you agree with me --
21 MR. FOWLER:  Well, him personally.
22 MR. BENNETT:  The suggestion is he
23 personally takes it and he --
24 MR. FOWLER:  Okay. I'll rephrase.
25 MR. FOWLER: Q  In any forfeiture that you've had

**Page 33**

1 dealing with seizure of vehicles, that you were a
2 caseworker on, did you present this to the Harris
3 County District's Attorney's Office and/or prosecutor's
4 office?
5     A    Oh, I'm sure.
6     Q    Why did you not do it in this case?
7     A    I don't make those decisions, sir.
8     Q    Did you ever contact DEA?
9     A    Me, in reference to Mr. Durr and Mr. Lett?
10     Q    Yes, Mr. Durr and Mr. Lett.
11     A    No.
12     Q    At the time of the stop, did you ever make the
13 statement, get asset forfeiture over here on a video?
14     A    Get asset forfeiture over --
15     Q    Or make a reference to asset forfeiture, asset
16 forfeiture division?
17     A    I believe that was hold me case number reference
18 asset forfeiture if I'm not mistaken.
19     Q    So you did reference an asset forfeiture case
20 number; correct?
21     A    It's the case number that's on this report.
22     Q    Do you call in an asset forfeiture for every
23 traffic stop?
24     A    No.
25     Q    I'm going to ask you one last question regarding

**Page 34**

1 Mr. Durr on the traffic stop that occurred on October
2 30th, 2010 on Interstate 185 in Hamilton, Harris
3 County, Georgia. What narcotics, State and/or Federal
4 law was he violating?
5     A    I recovered no narcotics at the scene.
6     Q    So you cannot say you personally as a law
7 enforcement officer of Harris County, Georgia Sheriff's
8 Department that he was in violation of any State and/or
9 Federal narcotics law? You have no personal knowledge
10 of that; is that correct?
11     A    Correct.
12     MR. FOWLER:    No further questions.
13 (DEPOSITION CONCLUDED AT 2:45 P.M.)

**Page 35**

CERTIFICATE OF REPORTER

GEORGIA, MONROE COUNTY

I, Sarah Peters, Georgia Certified Court Reporter 2775, CERTIFY that acting in such capacity on December 20, 2011, I reported the testimony of DREW CRANE, and on the foregoing pages, numbered 3 through 33, both inclusive, have transcribed or have had transcribed an accurate account of such testimony.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or outcome thereof.

WITNESS MY OFFICIAL SEAL and signature, this the 16 day of JANUARY, 2012.

_____
Georgia Certified Reporter 2775