```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
2                      COLUMBUS DIVISION

3   UNITED STATES OF AMERICA,        :
                                     :
4           Plaintiff,               :
                                     :
5       vs.                          : CIVIL ACTION
                                     : NO. 4:11-CV-38(CDL)
6   21,175.00 IN UNITED STATES       :
    FUNDS,                           :
7                                    :
            Defendant.               :
8
    ---------------------------------
9   COLUMBUS, GEORGIA    1:05  P.M.        DECEMBER 20, 2011

10       The deposition of TERRANCE DURR is being taken by

11  the Plaintiff; testimony is being given before Sarah E.

12  Peters, Georgia Certified Court Reporter 2775, in the

13  offices of U.S. Attorney's Office on December 20, 2011,

14  beginning at approximately 1:05  p.m.

15  ---------------------------------------------------------

16  APPEARANCES:

17  For the Plaintiff:     MR. DANIEL BENNETT
                           U.S Attorney's Office
18                         300 Mulberry Street, 4th Floor
                           Macon, Georgia 31201
19
    For the Defendant:     MR. DUSTIN J. FOWLER
20                         185 North Oates Street
                           Dothan, Alabama  36301
21
    Also Present: Ellie Parker
22

23

24

25
```

1                         DISCLOSURE

2    STATE OF GEORGIA          Deposition of:  TERRANCE DURR
     COUNTY OF BIBB:           Date:  December 20, 2011
3

4         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia, I make the following
     disclosure:
6
          I am a Georgia Certified Court Reporter and ma
7    here as a representative of Court Reporting Associates,
     Inc.
8
          I am not disqualified for a relationship of
9    interest under the provisions of O.C.G.A. §9-11-28(c).

10        Court Reporting Associates, Inc., was contacted
     by the offices of US Attorney's Office to provide
11   court-reporting services for this deposition.

12        Court Reporting Associates, Inc., will not be
     talking this deposition under any contract that is
13   prohibited by O.C.G.A. §15-14-37 (a) and (b).

14        Court Reporting Associates, Inc., has no
     exclusive contract to provide reporting services with
15   any party to the case, any counsel in the case, or any
     reporter or reporting agency from whom a referral might
16   have been made to cover this deposition.

17        Court Reporting Associates, Inc., will charge
     its usual and customary rates to all parties in the
18   case, and a financial discount will not be given to any
     party to this litigation.

19

20

21                         _Sarah P_____

22         Sarah Peters, GCCR 2775

23

24

25

1  STIPULATIONS:

2       MR. BENNETT:    Mr. Durr, my name's Dan

3  Bennett.  I'm an Assistant U.S. Attorney in the

4  Middle District of Georgia and we're here today

5  for your deposition in Civil Case No. --

6       MR. FOWLER:    Put on the record usual

7  stipulations?

8       MR. BENNETT:    Yeah.  One second.  Civil

9  Case No. 411-CV-38CDL.  We will do the normal

10  stipulations.  Just to be clear though,

11  objections, other than the form of the question

12  reserved, and then the other stipulation is

13  that he'll waive read and sign; is that

14  correct?  It's up to you.

15       MR. FOWLER:    Yeah, we'll waive that.

16       MR. BENNETT:    So then this is the

17  deposition of Terrance Durr, taken pursuant to

18  subpoena.  This transcript that will be

19  prepared from this could be used for all

20  purposes permitted under the Federal Rules of

21  Civil Procedure.

22

23

24

25

TERRANCE DURR

having first been duly sworn by the

court reporter, testified on

CROSS-EXAMINATION

BY MR. BENNETT:

     Q    Mr. Durr, have you ever had your deposition

taken before?

     A    No, I haven't.

     Q    Basically, the gist of it is I'm going to ask

you questions and you're going to answer my questions

and then the nice young lady down there is going to

take down what we all say and there'll be a transcript

prepared at the end of it.  If at any point you want to

take a break, you let me know and we'll take a break.

And if at any point you want to ask your lawyer a

question about a question -- something I've asked you,

I have no problem just -- you just let me know and I'll

take a stroll and go visit with my friends down the

hall and then I'll come back and we'll continue.  So I

say that in all seriousness; if you need that, you're

welcome to take it.

     A    Yes, sir.

     Q    In addition, I will ask you questions, I will do

my best to be very clear in what I'm asking.  It

occasionally happens that I ask a question that is less

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

4

```
 1   than clear and if I do that and I ask you a question
 2   that you don't understand or just doesn't make sense,
 3   let me know and I'll be happy to rephrase it and ask
 4   the question again.  And finally, I think I already
 5   said this, but if you want to take a break at any
 6   point, you know.  Do you have any questions about those
 7   preliminary instructions?
 8       A    No, sir.
 9       MR. BENNETT:    For counsel, at any point
10   when you want to chime in and ask me to clarify
11   something or to -- you know, just discuss
12   something or --
13       MR. FOWLER:    Excluding the usual
14   objections, something we have started doing, if
15   you ask him his Social, we'd ask that
16   everything but the last four digits be
17   redacted.
18       MR. BENNETT:    Certainly, that'd be fine.
19   And also, like I said, if you have anything you
20   want to discuss, just at some point let me
21   know, we'll go off the record, we'll talk about
22   it.
23       MR. BENNETT:  Q    All right.  Those are the
24   ground rules.  Mr. Durr, tell me, sir, where were you
25   born?
```

1    A    Dothan, Alabama.

2    Q    Did you grow up there?

3    A    Yes, sir.

4    Q    Now, did you complete high school?

5    A    Yes, sir.

6    Q    Graduated from 12th grade?

7    A    Yes, sir.

8    Q    Did you go to college, at all?

9    A    No, sir.

10   Q    You can read and write English?

11   A    Yes, sir.

12   Q    Is it fair to say at some point -- I'd also need

13   upon the record, I apologize, there is apparently --

14   there is some sort of construction going on in the

15   building, so we've got the background noise of drilling

16   and I might just stop at some point, if it gets to be

17   too loud.

18        Okay.  At some point, is it fair to say that

19   you ran into some trouble with the law?

20   A    Yes, sir, I have.

21   Q    And we're not going to go through all of that,

22   but I am interested in talking a little bit about the

23   federal conviction.  Is it correct you've only been

24   convicted one time in Federal Court?

25   A    Yes, sir.

1    Q    Okay.  And what was that for?

2    A    Drug conspiracy.

3    Q    What kind of drugs?

4    A    Crack cocaine.

5    Q    And when was that?

6    A    1996.

7    Q    And how long did you serve?

8    A    Seven years.

9    Q    So you got out in what year?

10   A    2003.

11   Q    And when you got out, were you on a period of

12   supervised release?

13   A    Yes, sir.

14   Q    How long was that; do you recall?

15   A    Six -- five years.

16   Q    And then did you have any problems while on

17   supervised release?

18   A    I had a couple of incidents, yes, sir.

19   Q    Did you ever have to go back into prison for

20   that?

21   A    No, sir.

22   Q    And so, all said, you were clear of supervised

23   released roughly what date -- what year?

24   A    2008.

25   Q    Okay.  Now, since 2008, have you had any other

```
 1    state convictions?

 2       A    Since 2008?

 3       Q    Yes, since you went off federal supervision.

 4       A    No.  No, sir.

 5       Q    Have you been arrested for anything?

 6       A    Yes, sir.

 7       Q    What were you arrested for?

 8       A    Domestic violence.

 9       Q    And what year were you arrested for domestic

10    violence?

11       A    This year.

12       Q    In 2011?

13       A    Yes, sir.

14       Q    Is that the incident where you were shot?

15       A    Yes, sir.

16       Q    Other than that incident, is there any other

17    instance where you've been arrested since 2008?

18       A    Yes, sir.  Yeah.  Yes, sir, last year.

19       Q    Last year?

20       A    Yes, sir, a DUI.

21       Q    So one domestic violence incident in 2011?

22       A    Yes, sir.

23       Q    One DUI in two thousand --

24       A    '10.

25       Q    But nothing else with drugs?
```

```
 1      A    No, sir, not at all.

 2      Q    Now, let's move ahead to the year 2010.  Now,

 3  I'm just going to give you a little bit of instruction

 4  before we go into this next series of questions.  What

 5  I'm interested in is the year 2010, so everything I'm

 6  asking you, I want you to think about 2010.

 7      A    Yes, sir.

 8      Q    For the record, the traffic stop in this case

 9  occurred on October 30th of 2010, so I'm really

10  interested in the period of time before your traffic

11  stop; is that clear?

12      A    Okay.

13      Q    So in 2010, where were you living?

14      A    I was staying in Ozark with my grandma.

15  Ozark, Alabama.

16      Q    Now, at that time, did you own a house anywhere

17  else?

18      A    No, sir.

19      Q    So you were just living with grandma?

20      A    Yes.

21      Q    Were you paying her rent or just staying with

22  her as a relative?

23      A    Light bill.

24      Q    I'm sorry?

25      A    Just paying the light bill.
```

1    Q      Paying the light bill?

2    A      Yes, sir.

3    Q      How much did the light bill -- I'm asking you

4  for an estimate, I just want a sense, what does the

5  light bill run?

6    A      Probably just give her a hundred, hundred a

7  month.

8    Q      Fair enough.  And other than $100 light bill,

9  did you have any other living expenses during 2010?  By

10  that, I mean did you pay for groceries?  Did you pay

11  for anything else at the house?

12    A      No, sir.

13    Q      So just basically a hundred bucks and lived with

14  grandma?

15    A      Yes, sir.

16    Q      Sir, do you have any children?

17    A      Yes, sir.

18    Q      I don't want to hear their names, but can you

19  just tell me their ages, so I get a sense of how many

20  children you have and how old they are?

21    A      20 and six.

22    Q      Now, do you pay child support for the

23  6-year-old?

24    A      No, sir.

25    Q      You do not.  Okay.  Now, where does the mother

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

10

1   live, the mother of the 6-year-old?  See, that's an

2   example of my question.  You know what I'm asking, but

3   I didn't ask it very clearly.  Where does she live?

4      A    She stay in Kensey, Alabama.

5      Q    Now, and the 6-year-old lives with her?

6      A    Her.

7      Q    Now, do you own a vehicle?

8      A    Yes, sir.

9      Q    Do you own it outright or do you pay a note on

10  it?

11     A    A note.

12     Q    What's your note -- what's your monthly note?

13     A    I got a Chevrolet Impala, which is $200 -- $205

14  a month.

15     Q    Now, did you have that car back in 2010, as

16  well, or is that a car you've got now?

17     A    That's a car I got in 2010, got like August of

18  2010.

19     Q    August of 2010?

20     A    Yeah.

21     Q    So you had that car note roughly around the time

22  of the traffic stop; is that fair?

23     A    Right.

24     Q    Now, your salary in 2009 -- for tax year 2009

25  was approximately $31,000; is that correct?

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

11

1    A    Right.

2    Q    And was it in 2010, did you have roughly -- did

3  you make roughly the same amount?

4    A    Yes, sir.

5    Q    Right around 31 or $32,000?

6    A    Yes, sir.

7    Q    So you're making $32,000 a year in 2010, or

8  thereabouts, and all these amounts are approximate, I'm

9  not trying to trick you with the amount, I'm just

10 trying to get a sense of it.  So you're making $32,000

11 a year; is that correct?

12   A    Yes, sir.

13   Q    You have a $100 a month light bill?

14   A    Right.  Yes, sir.

15   Q    You've got a $200 or so car note?

16   A    Right.

17   Q    All right.  Other than that, are there other

18 expenses that you have -- your month, do you have any

19 other monthly expenses?

20   A    Cell phone.

21   Q    Give me a sense of the cell phone.  Fifty bucks,

22 a hundred bucks?

23   A    No, about 100, $120 a month.

24   Q    $120 month for the cell?

25   A    Yes, sir.

```
 1      Q    All right.  Anything else?
 2      A    I had got a loan back in '08, I think -- '07,
 3   that's like $114 a month.
 4      Q    So 114 a month --
 5      A    Right.
 6      Q    -- for the loan?
 7      A    Right.  Credit card, 135.
 8      Q    Is that a minimum payment?
 9      A    Yeah.  Well, sometimes it goes like 85 to 135.
10      Q    Sounds good.  What kind of balance do you hold
11   on that card?
12      A    Probably now it's like 4,000.
13      Q    Any other monthly expenses right around that
14   time in 2010 that you can think of?
15      A    I had -- well, sir, I really don't have no
16   bills.  That is about it.
17      Q    And for the record, where were you working in
18   2010?
19      A    Adams Beverages.
20      Q    Is that somehow affiliated with Budweiser?
21      A    Oh, yeah.  Yes, sir.
22      Q    Is that like a -- explain the relationship
23   between Adams and Budweiser for me.  Is it a
24   distributor or what is it?
25      A    Distributor.
```

1    Q    What would you do for Adams and, again, just

2    focusing on 2010, what were you doing for them in that

3    year?

4    A    Draft technician.

5    Q    What does that mean?

6    A    I go around and start draft units in bars, clean

7    the lines and fix them.

8    Q    And you were paid a salary for that?

9    A    Yes, sir.

10   Q    And so how does Adams pay you guys?  Are you

11   paid -- or pay you, are you paid bi-weekly, are you

12   paid -- or bi-monthly, rather?  Are you paid --

13   A    Bi-weekly.

14   Q    I mean every two -- you get paid every two

15   weeks?

16   A    Every two weeks.

17   Q    Okay.  That's what I meant.  How much would you

18   get paid every -- after, you know, taxes are taken out

19   and everything, what was your take-home every two

20   weeks?

21   A    My take-home was like $1020 -- $25 or something

22   like that, $1030, something like that.  Might have been

23   more than that.  I can't --

24   Q    I'm asking you for approximate amounts, so --

25   A    Oh, okay.  Okay.

```
 1     Q    -- I'm not -- if the tables were -- I will say
 2   if the tables were turned and you were asking me these
 3   questions, I would be struggling to tell you exactly
 4   the right amount, so just -- I understand.  I'm just
 5   trying to get a sense of it.  So a thousand bucks in
 6   your paycheck.  How would Adams pay?  Would it be a
 7   check or a direct deposit?  How did that happen?
 8     A    Direct deposit.
 9     Q    Where would they direct deposit the money to?
10     A    Army Aviation.
11     Q    Is that fair to say that's into a checking
12   account?
13     A    Yes, sir.
14     Q    Is that the only account you have?
15     A    Yes, sir.
16     Q    You don't have any other savings accounts
17   anywhere?
18     A    Just there.  Just Army Aviation.
19     Q    So with that background in mind, let's turn a
20   little more specifically to the traffic stop.  So let's
21   go back to the day before the traffic stop.  What were
22   you doing on October 29th of 2010, if you remember?
23     A    I worked.  I got off work, lift weights, worked
24   out.  Later on, went to a nightclub.  Left the
25   nightclub about 2:00 o'clock, the 30th, 2:00 o'clock in
```

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

15

1   the morning.

2      Q    2:00 o'clock in the morning.  All right.  Now,

3   let's get a little more specific.  You said nightclub,

4   what kind of nightclub is it?

5      A    Strip club.

6      Q    And it's in where?

7      A    Dothan.

8      Q    And what's the name of it?

9      A    Playboy Palace.

10     Q    So it's a strip club in Dothan?

11     A    Yes, sir.

12     Q    How far do you live away from the strip club?

13     A    Ozark.

14     Q    Ballpark?  Hour drive?  Half hour drive?

15     A    Half hour.  Probably like 20 minutes.

16     Q    So you got off -- do you remember what day of

17  the week it was on the 29th of October in 2009?

18     A    Friday.

19     Q    So you get off of work on a Friday.  You go to

20  the strip club; is that correct?

21     A    No, sir, go lift weights.

22     Q    Lift weights, yes, sir.

23     A    Yes, sir.

24     Q    Go lift weights and then you head to the strip

25  club?

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

16

1    A    Went to the strip club later on, yes, sir.

2    Q    You were there from -- approximately how long

3  were you there, how many hours?

4    A    I went to the strip club probably around about

5  11:00 and left like 2:00.

6    Q    11:00 and 2:00?

7    A    I think.

8    Q    And then do you have a sense of how much money

9  you spent that night there?

10    A    I can't remember.

11    Q    Fair enough.  Now, did you have a lot of

12  currency on you when you went to the club?

13    A    No.

14         MR. FOWLER:    Object to the form.

15    MR. BENNETT:  Q    How much currency did you have

16  on you, if you recall?

17    A    I probably had about $600 on me, I guess, I

18  think.  I can't remember, yeah, really definitely how

19  much but --

20    Q    You didn't have 21,000 on you?

21    A    No.  No.  No.

22    Q    So you had about 600?

23    A    Six, 700, yes, sir.

24    Q    It's 2:00 a.m., you leave the strip club.  Where

25  do you go?

1    A    I went home.

2    Q    Did you go to sleep at that point?

3    A    Yes, sir.

4    Q    Well, tell me what happened next.

5    A    My friend, Jerry Lett, which is a ex door -- ex

6   next-door neighbor, he came and picked me up from the

7   house and took me to Atlanta.

8    Q    Now, let's talk a little bit about that.  When

9   had you decided that you were going to go to Atlanta?

10       MR. FOWLER:    Object to form.

11       THE WITNESS:  A      Probably all that week more

12   than likely.  Yeah, all that week.

13       MR. BENNETT:  Q      What was the purpose of your

14   trip to Atlanta?

15    A    To go get some houses out of foreclosure, to

16   check on them and see how much it was going to cost to

17   get them out and make -- prepare the houses.

18    Q    We'll talk more about that later.  So?

19    A    Okay.

20    Q    Okay.  That was the stated -- that was the

21   purpose of the trip; correct?

22    A    Yes, sir.

23    Q    And you decided earlier in the week you were

24   going to do that?

25    A    Yes, sir.

1    Q    Why was Jerry going to go with you?

2    A    Well, he just -- I just was wanting somebody to

3  ride with me at the time, you know.  That's all.

4    Q    And how long had you known Jerry at that point?

5    A    2006.

6    Q    You said you were next-door neighbors?

7    A    Yes, sir.

8    Q    Are you still friends with him?

9    A    Yes, sir, we talk sometimes.

10   Q    Now, why was he driving?

11   A    Well, I had -- my license was suspended, yeah.

12   Q    Why was your license suspended?

13   A    The DUI, 2010, they took my license

14  automatically.

15   Q    So he was basically giving you a ride?

16   A    Yes, sir.

17   Q    Now, whose car was that?  Who owned the car?

18       MR. FOWLER:     Objection to form.

19   THE WITNESS:  A    I really don't know who owned

20  that car, but he was always on it, so --

21   MR. BENNETT:  Q    You don't know the owners of

22  that car?

23   A    No, sir.

24   Q    So if I asked you who Cedric Dion Goode is,

25  you're not going to know who that is; is that correct?

```
 1     A    No, sir.  Correct.

 2     Q    Also, if I asked you if you knew who Terry

 3  Williams is?

 4     A    Don't know him.

 5     Q    Did either you or Jerry Lett consume alcohol in

 6  the car?

 7     A    No, sir.

 8     Q    Let me ask it this way:  When did you take your

 9  last drink?

10     A    It was probably around --

11        MR. FOWLER:     Object to form on that.

12     THE WITNESS:  A       -- 1:00 -- probably 1:00

13  o'clock.

14     MR. BENNETT:  Q      The night prior?

15     A    That -- yeah, that was the same day.  Well,

16  yeah.

17     Q    I understand.

18     A    Yeah.  Yeah.

19     Q    So we're saying the same thing.  Basically, you

20  had -- that was your last cocktail you had at the strip

21  club?

22     A    Right.  Yes, sir.

23     Q    Now, did you also have some marijuana at the

24  strip club?

25     A    No.  No, sir.
```

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

20

1    Q    Did you have any marijuana within the 24 hours

2    prior to your traffic stop?

3    A    No.  No.

4    Q    Do you know if Jerry Lett did?

5    A    He didn't.

6    Q    So neither of you had marijuana on -- neither of

7    you had consumed marijuana to your knowledge?

8    A    No, sir.

9    Q    How long had you been driving before you were

10   stopped?

11   A    I kind of fell off and went to sleep.  Probably

12   -- Harrison County, that's probably an hour and a half,

13   two hours maybe.  I don't think that's too far from

14   Atlanta.  I'm not really familiar with the Atlanta area

15   like that.  Like Jerry, he's from up there, too, so he

16   knew his way around.

17   Q    Can you describe what happened once you were

18   stopped?

19   A    Like I say, I was on the passenger side asleep.

20   I heard Jerry, he tapped me, said, hey, man, we're

21   being pulled over.  I say, yeah.  Oh, okay.  I said,

22   you speeding or something?  He said, no, I wasn't

23   speeding, so you want me to tell you everything?

24   Q    Yeah, please do.

25   A    Okay.  So the cop came to my side, asked Jerry

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

21

1   for his license, told him to step out of the car.  I

2   guess, I don't know what he talked to Jerry about in

3   the back.  Came back to my side, asked me for my ID.  I

4   told him I don't have it.  I gave him my name.  And he

5   told me to step out of the car and basically, just went

6   -- asked Jerry Lett can he search the car.  Because

7   Jerry told him no -- I mean yes, he could search the

8   car.  So he searched the car and I guess found my money

9   that I had on my side up under the seat.

10      Q    Now, let me ask you a couple of quick questions

11  about that.  First of all, did the officer pat you down

12  when you got out of the car?

13      A    Yeah, he did that.

14      Q    Now, did he ask you for permission to do that?

15      A    Yeah, he asked permission.

16      Q    And is it true that you had some currency with

17  you?

18      A    In my pocket?

19      Q    Yes.

20      A    Yes, sir.

21      Q    Do you remember how much you had with you?

22      A    I think it was around --

23      Q    Approximate amount is fine.  I'm just curious.

24      A    Probably -- I probably had like 700 with me.  I

25  put some more money back in my pocket because I knew we

1   was going out, in Atlanta, too, probably, yeah.

2       Q    Now, did the officer ask you if you had any

3   other currency in the car?

4       A    I can't remember if he asked me.  I know he

5   asked Jerry, because he told me that Jerry said there's

6   some money -- I think I remember Jerry told me he had

7   -- he told me that Jerry told him there was some money

8   in the car, so when he searched it, he seen the money.

9       Q    So you don't -- I just want to make sure I

10  understand.  Do you recall if the police officer asked

11  you if you had any other currency in the car?

12      A    Yeah, I think -- yeah, he did.

13      Q    Do you remember what you told him?

14      A    I told him yes.

15      Q    You told him yes?

16      A    Yeah.

17      Q    Did you tell him where it was?

18      A    No.  He just searched it and he found it.

19      Q    Well, what I want to know is did you tell -- so

20  the conversation, the officer asked you do you have any

21  other currency in the car and your response was what?

22      A    I really don't want to say the wrong thing.  I

23  mean as far as I can remember, I think I said yes.  I

24  know I owned up to the money, but I can't remember if

25  he asked me did I have money in the car.  See what I'm

1  saying?  I can't remember that part.  I know he asked

2  Jerry and Jerry told him yes.

3     Q    Yeah.  I'm not worried about Jerry.

4     A    Okay.

5     Q    I'm worried about -- what I'm trying to ask you

6  and it's kind of important, so I want to make sure

7  we're saying the same thing.  When the officer asked

8  you if you -- let's do it this way.  The officer asked

9  you if he could pat you down; correct?

10    A    Yes.

11    Q    And the officer -- is it true that the officer

12 found some currency at that point?

13    A    Right.  Yes.

14    Q    And then do you recall if the officer asked you

15 at that point, asked you is there any -- do you,

16 meaning you, Mr. Durr --

17    A    Me.

18    Q    -- have any more money in the car?

19    A    No, I don't recall him asking me that.  I don't

20 remember it.  I really don't.

21    Q    No, that's fine.  I just want to make sure that

22 that's your testimony.  Okay.  So you don't recall him

23 asking you that.  So you step to the rear of the

24 vehicle at that point; is that correct?

25    A    Yes, sir.

1    Q    What happened next?

2    A    Then he went through the car.  Jerry came

3  permission to go through the car.  Went through the car

4  and he found the money.  Then he asked whose money was

5  it.  Before I got any chance to even say something --

6  say anything, Jerry said it's his.  It's his money, so

7  -- which it was.  I said, yeah, it's mine.

8    Q    Now, the very first time that the officer asked

9  about the currency, who owned it?  Did you speak up at

10  that point and say it's mine?

11   A    Yes, sir.

12   Q    You did?

13   A    Yeah.

14   Q    And, in fact, it is your testimony that it is

15  your money?

16   A    It is my money, yes, sir.

17   Q    It's not Jerry's money?

18   A    No.  No.  No.

19   Q    So were you asleep when Deputy Crane pulled you

20  over?

21   A    Yes, sir.  I mean I wasn't still asleep, but I

22  was -- when he got behind Jerry, I was asleep.  When he

23  pulled us over, I was awoke.

24   Q    Now, I was going to ask you why you didn't have

25  your license with you, but I think I already know the

1    answer because it was suspended; that's correct, sir?

2    A    That's correct.   Yeah.

3    Q    Now, even though your license was suspended at

4    that point, did you have any other identification on

5    you?

6    A    No, I didn't.

7    Q    Let me ask you this:   How are you going to be

8    conducting business up in Atlanta if you don't have any

9    identification at all with you?

10   A    Well, I guess Social Security, Social Security

11   number and so forth.   I really --

12   Q    But you didn't have any other picture ID on you;

13   is that correct?

14   A    You know what?   I had an old, old driver's

15   license, but I told the officer my license was

16   suspended, but it's an old ID, like -- because it

17   wasn't -- it wasn't, you know, accurate, so -- yeah, it

18   was an old ID.

19   Q    Let's get to --

20   A    But I went ahead and told him that it was

21   suspended.

22   Q    Yes, sir.   I'm sorry.   I didn't mean to

23   interrupt you.   Well, let's move ahead to the amount --

24   to the -- you know, the currency that was seized in

25   this case.   Do you recall how much exactly it was?

1    A    21,000.

2    Q    And where was the 21,000 in the car?

3    A    It was in a bag up under the seat of my

4 passenger side.

5    Q    How did the money get into the car?

6    A    Me.  I brought it out of the house.

7    Q    Why did you put it underneath the passenger

8 seat?

9    A    Well, because the car's so small and compact on

10 the inside of the car, I just didn't want to be

11 stepping all on it, so I just, you know, pushed it up

12 under the seat.  See, in case we're sitting at a gas

13 station or something like that, somebody -- didn't want

14 nobody to see it and get robbed.

15    Q    Now, let's talk about a little bit about this

16 currency.  Immediately prior to putting it in the car,

17 where was the currency stored?

18    A    In my house, in my room.

19    Q    Where in your room?

20    A    Closet.

21    Q    Did you take all of the currency from your

22 closet when you put it in the car?

23    A    Yes.

24    Q    Did you or did someone else package it?

25    A    Me.

1     Q     And in what manner did you package the currency?

2           MR. FOWLER:     Object to form.

3     THE WITNESS:  A          Thousand dollar bundles.

4     MR. BENNETT:  Q         And what did you use to put

5     them in that -- the currency in thousand dollar

6     bundles?

7     A     Rubber bands.

8     Q     Where did you find the rubber bands?

9     A     I bought them at a Dollar General.

10    Q     Why did you use rubber bands?

11    A     That's just the way I -- that's the way I just

12    -- that's the way I put them in stacks, so.

13    Q     So the $21,000 that was in your closet, how did

14    that $21,000, that precise currency, how did it get

15    into the closet?

16    A     What you mean?  As far as --

17    Q     I mean how did you get $21,000 -- I'm just

18    moving the currency backwards from the car to your

19    closet.  I want to know did it get in the closet?

20    A     I mean I put it in the closet.

21    Q     Where did you get it from?

22    A     From working over the years.

23    Q     Where did you get the currency itself?

24          MR. FOWLER:     Object to form.

25    MR. BENNETT:  Q        Where did you get the cash?

1        MR. FOWLER:        Object to form.

2     THE WITNESS:  A        By pulling it out the bank from

3   time to time.   That's it.

4     MR. BENNETT:  Q        So you would have withdrawal

5   slips from your bank to show you periodically

6   withdrawing cash over time and putting it in your

7   closet?

8     A     Yes, sir.

9     Q     Over what period of time did it take you to

10  accumulate $21,000?

11    A     Ever since I been at -- been there.

12    Q     Been where?

13    A     Adams Beverages.

14    Q     So for how many years is that?

15    A     February 5th it'll be eight years.

16    Q     So it's your testimony that you've slowly

17  accumulated $21,000 in cash over eight years; is that

18  correct?

19    A     Yes, sir.

20    Q     And the $21,000 is derived completely from your

21  wages at Adams?

22    A     Yeah, and also a loan that I go from Army

23  Aviation, the loan I was telling you about, I got a

24  $4,500 loan.   And my dad won -- he was gambling down at

25  Country Crossing.

```
 1          MR. FOWLER:      When it was legal.

 2      THE WITNESS:  A        When it was legal, yeah.  He

 3  won 10,000 and he loaned me 5 until I got my income

 4  taxes.

 5      MR. BENNETT:  Q        If I'm looking at a stack of --

 6  at a pile of currency that's in your closet, break it

 7  down for me what money is from the bank, what money is

 8  from a loan and what money is from your dad.

 9      A    Like I say 5,000 came from my dad.

10      Q    When did he give you that 5,000?

11      A    It's 2010 -- 2010, I forgot which month -- what

12  month in 2010 he gave it to me.

13      Q    He gave it to you in cash?

14      A    Yes, sir, because they gave it to him in cash.

15  I was with him.

16      Q    And you took it from him, and what did you do

17  with it?

18      A    And I put it up.

19      Q    Put it in the closet; right?  Is that what you

20  mean?

21      A    Well, I can't remember actually if I put it in

22  the closet.  Like I put it up in my house, yeah, at the

23  time.

24      Q    Well, I've got to ask you that then.  So other

25  than the closet, where would you store money in your
```

1    house?

2        A    That's -- my grandma's room, up under her bed or

3    the closet.   The closet is where I majority kept it at.

4        Q    Now, the closet --

5        A    See, that's why I say, I can't remember because

6    I might have had put it under my grandma's bed at the

7    time.   I can't remember where I went in the house and

8    put it up, but I know it was in the house.   But when I

9    was going up to Georgia, we was going to Atlanta, it

10   was in -- everything was in my room in my closet.

11       Q    So you would store money in your grandmother's

12   house in a closet?

13       A    Yes, sir.

14       Q    And then you'd also store it under the bed;

15   correct?

16       A    Yes, sir.

17       Q    Your grandmother's bed; correct?

18       A    Yes, sir.

19       Q    Any other places you would store the currency?

20       A    No.   That's it.

21       Q    Mr. Durr, let me ask you a couple of questions.

22   Has your grandmother's house ever been robbed?

23       A    Yes, sir.

24       Q    Presumably that was before you started storing

25   currency though; right?

1    A    No.

2    Q    They just didn't find the currency?

3    A    They just -- they -- no, sir, they didn't find

4    it.

5    Q    Now, if money is stolen from your grandmother's

6    house, who's going to find it and bring it back to you?

7    A    What you mean?

8         MR. FOWLER:     Object to form.

9    THE WITNESS:  A     Find and bring it back?

10    MR. BENNETT:  Q     Yeah.  In other words, if

11    money's stolen from a house, who's going to be in

12    charge of looking for it and getting it back to you?

13    A    Well, the way they broke in, they didn't -- they

14    broke in, they didn't ever get nothing.

15    Q    What I'm getting at is do you think there are

16    safer places to store currency?

17    A    Well, actually, where my grandma stay, it's like

18    four houses on that street and stay off like in the

19    woods like, so I just wouldn't think nobody will come

20    in and break in a house like that.

21    Q    Okay.  Let me ask you this:  If a bank is robbed

22    and you have an account there, do you lose your money?

23         MR. FOWLER:     Object to form.

24    THE WITNESS:  A     That's what I always heard.  I

25    mean I -- I mean I really don't know really.  I don't

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

32

1   know, unless you've got insurance on your money, I

2   guess.  I really don't know.

3       MR. BENNETT:  Q     Did it ever occur to you that it

4   might not be a safe thing to do, to transport $20,000

5   or $21,000 in cash up to Atlanta?

6           MR. FOWLER:     Object to form.

7       THE WITNESS:  A     Well, I know it wasn't safe at

8   my house, if I'm not there because it got broken into

9   and I just -- yes, sir, that's why I took it all with

10  me.

11      MR. BENNETT:  Q     What exactly were you going to

12  do with the $21,000 in Atlanta?

13      A    I was going get the house and see how much it

14  was, it cost to get the houses out of foreclosure, my

15  house, my dad's house and my grandma's house and also

16  repair the houses.

17      Q    Who were you going to meet with?

18      A    Bank of America.

19      Q    On what day?

20      A    Monday.

21      Q    What did you plan to do with the $21,000?

22      A    I mean, like I say, repair the houses and get

23  the houses out -- whatever it cost to get the houses

24  out of foreclosure.  I was going to pay on that,

25  whatever -- for me and my parents and my grandmamma and

1  dad.

2  Q   Who had you talked with -- had you talked with

3  anyone at Bank of America prior to heading for Atlanta?

4  A   Yes, I had some phone calls and they said the

5  branch was in Atlanta, but like I say, Jerry's from

6  Atlanta and I didn't -- I'm not familiar with Atlanta,

7  so I was going to go in and talk to them and give them

8  my name, like I say, and my Social Security number and,

9  you know, just tell them who I am and what I was there

10  for.

11  Q   And take the plastic bag with $21,000 and put it

12  on the desk; is that right?

13      MR. FOWLER:     Object to form.

14  THE WITNESS:  A     I don't think -- I wasn't going

15  to do it like -- I don't know, I was -- I mean I know

16  it was legit, so I mean I just wasn't going --

17  MR. BENNETT:  Q     That's what I'm trying to

18  understand.  What I'm trying to understand is why you

19  would take $21,000 in cash and travel to Atlanta and

20  what business you expected to conduct with the bank?

21      MR. FOWLER:     Object to form.

22  THE WITNESS:  A     To get the houses out of

23  foreclosure.

24  MR. BENNETT:  Q     Did you have an appointment at

25  the bank on Monday?

1   A   No, sir, I didn't have an appointment.

2   Q   This $21,000, is this your life savings?

3   A   What you mean, as far as?

4   Q   I mean do you have any other money, besides --

5   saved anywhere, besides this $21,000?

6       MR. FOWLER:       Object to form.

7   THE WITNESS:   A       No.   No, sir.

8   MR. BENNETT:   Q       No 401(k)?

9   A   I don't have that.

10   Q   No additional savings account anywhere?

11   A   No, sir.

12   Q   So this is the only money that you had saved and

13   accumulated in your entire life; is that correct?

14   A   Yes, sir.

15   Q   And you took your life savings and put it in a

16   plastic bag; is that correct?

17   A   Yes, sir.

18   Q   And drove it up to Atlanta?

19   A   Yes, sir.

20   Q   And you also purchased rubber bands; is that

21   correct?

22   A   I may have had the rubber bands for years.   I

23   mean, you know, from buying like Dollar General before

24   -- when I was accumulating the money.   I'm sorry.   I

25   got them at Dollar General, yeah.

COURT REPORTING ASSOCIATES, INC. 577 Mulberry Street. Suite 910  Macon, Georgia 31201  (478) 742-1459

35

1    Q    Why did you decide to put it in a thousand

2  dollar increments?

3    A    That's just something -- I just -- I don't know.

4  Just really don't know.

5    Q    When the law enforcement officer asked you and

6  Mr. Lett whose money it is, did you immediately say

7  it's mine?

8    A    Yeah.  Before I got a chance to say something,

9  Jerry had pointed to me anyway and said it was mine,

10  but I was going to tell him it was mine.

11    Q    Now, do you remember if you responded the first

12  time the officer asked whose money it is?

13    A    I can't remember.  I probably did.  I mean I

14  didn't have no reason not to.

15    Q    Because you'd agree that's not a complicated

16  question, who owns the money; right?

17    A    Right.  Right.

18    Q    Do you recall telling the officer that the money

19  belonged to you, your father and your grandmother?

20    A    What I meant -- yes, sir.  What I meant was that

21  I was going to take care of the houses for us and

22  repair the houses.  Yes, sir.

23    Q    Is it true that you own a house up in Atlanta?

24    A    Yeah.

25    Q    How did you come to own that house?

1    A    My step-mom's brother, Ron, that stays in

2  Atlanta, he had said he had a business proposition for

3  about nine of us and we all purchase the houses.

4    Q    Do you know who Alicia Burnett is?

5    A    Uh-uh.  What did they say?  I mean who is that?

6    Q    I was hoping you know, because -- and did you

7  purchase a house from her?

8    A    No.

9    Q    Who had the house before you bought it; do you

10  know?

11    A    No.

12    Q    Now, tell me a a little bit about these houses

13  that you've got.

14        MR. FOWLER:     Object to form.

15        MR. BENNETT:    Which part?  I haven't

16    asked the question yet.

17        MR. FOWLER:     Well, you made a statement,

18    the houses he's got.  He never claimed he owned

19    more than one house.

20        MR. BENNETT:    All right.

21    MR. BENNETT: Q     Do you own a house in Atlanta?

22    A    Yes, sir.

23    Q    Do any of your relatives own houses in Atlanta?

24    A    Yes, sir.

25    Q    The money was intended to see about foreclosures

1    on which properties?

2        A     My grandma, my dad, and mine.

3        Q     When did you buy your house?

4        A     2007, I think.

5        Q     When did your dad buy his house?

6        A     Everybody 2007.

7        Q     So there are three houses total; is that

8    correct?

9        A     Yeah.

10       Q     And the money that you were traveling with was

11   intended to get all three houses out of foreclosure; is

12   that correct?

13       A     Yes, sir.

14       Q     What kind of shape are these houses in?

15       A     Real bad shape.

16       Q     How much did you pay for the house that you

17   have?

18       A     64,000 -- 64 or 68,000.

19       Q     And you paid 68,000 and that's the pictures that

20   you sent to us in response to discovery; is that right?

21       A     Yes, sir.

22       Q     Do you know how much those houses are worth

23   right now?

24       A     No, sure don't.

25       Q     Is it less than 68,000?

```
 1        A    I don't know.

 2             MR. BENNETT:    Just give me one second,

 3      please.   That's it.

 4      (DEPOSITION CONCLUDED 1:50 P.M.)

 5      ----------------------------------------------------------

 6                      CERTIFICATE OF REPORTER

 7      GEORGIA, MONROE COUNTY

 8        I, Sarah Peters, Georgia Certified Court Reporter

 9      2775, CERTIFY that acting in such capacity on December

10      20, 2011, I reported the testimony of TERRANCE DURR,

11      and on the foregoing pages, numbered 3 through 39, both

12      inclusive, have transcribed or have had transcribed an

13      accurate account of such testimony.

14             I FURTHER CERTIFY that I am not counsel for nor

15      related to any of the parties; nor am I interested in

16      the event or outcome thereof.

17             WITNESS MY OFFICIAL SEAL and signature, this the

18      5 day of JANUARY, 2012.

19

20

21      _____
                Georgia Certified Reporter 2775
22

23

24

25
```

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

UNITED STATES OF AMERICA,     :
         Plaintiff,         :     **CASE NO.** 4-11-cv-38 (CDL)
                       :

     **v**                  :
                       :

**$21,175.00 IN UNITED STATES**
**FUNDS,**               :
       **Defendant Property.**     :

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, Plaintiff, the United States of America, by and through its attorney, the United States Attorney for the Middle District of Georgia, brings this complaint and alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure:

### *Nature of the Action*

1.    This is a civil action *in rem* brought pursuant to 21 U.S.C. § 881(a)(6), to forfeit and condemn to the use and benefit of the United States of America certain personal property, to wit: $21,175.00 in United States funds, (hereinafter "Defendant Property").

### *The Defendant in Rem*

2.    The Defendant Property consists of $21,175.00 in United States funds, that were seized from Terrance Devon Durr and Jerry Lamar Lett on October 30, 2010, on Interstate 185, in Hamilton, Harris County, Georgia. It is presently in the custody of the United States Marshals Service and has been deposited into the Seized Asset Deposit Fund Account.



### Jurisdiction and Venue

3.      Plaintiff brings this action *in rem* in its own right to forfeit the Defendant Property.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).  Upon the filing of this complaint, the Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the Plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1395, because the Defendant Property was seized in Harris County, Georgia, which is a place within the Middle District of Georgia.

6.      The seizure was adopted by the United States Department of Justice, Drug Enforcement Administration ("DEA"), which began administrative forfeiture proceedings. On or about January 13, 2011, Terrance Durr, through his counsel, Jackie Patterson, Esq., 2970 Peachtree Road, Suite 830, Atlanta, Georgia, 30305, filed a claim with the DEA, after which the DEA referred the matter to the United States Attorney for the Middle District of Georgia.

### *Basis For Forfeiture*

7.      The Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; and/or 3) money used or intended to be used to facilitate a violation of the Controlled Substances Act.

2

Case 4:11-cv-00038-CDL   Document 1   Filed 04/13/11   Page 3 of 7

### *Factual Allegations*

8.      On October 30, 2010, at approximately 7:37 a.m., Deputy Drew Crane, of the Harris County Sheriff's Office ("HCSO") stopped a white Chrysler Sebring for a traffic violation on Interstate 185 North near mile marker 20.

9.      Deputy Crane approached the passenger side of the vehicle to make contact with the driver, later identified as Jerry Lamar Lett ("Lett").

10.     Upon Lett rolling down the window, Deputy Crane detected a strong odor of alcohol and marijuana coming from inside the vehicle.  Deputy Crane also observed a single key in the ignition of the vehicle.

11.     Deputy Crane asked Lett for his driver's license and proof of insurance. When Lett handed him his documentation, Deputy Crane observed that his hand was trembling.

12.     Deputy Crane also observed that the passenger, later identified as Terrance Devon Durr ("Durr"), appeared to be pretending that he was sleeping, and that he had a large bulge in his left front pant's pocket.  Upon asking Durr for his driver's license, Deputy Crane observed that Durr then appeared to be completely awake and stated that he did not have one.

13.     Deputy Crane asked Lett to step out of the vehicle so that he could issue him a warning citation for failing to maintain his lane, and for a burnt out tag light.  Lett and Durr looked at each other "bug eyed" before Lett exited the vehicle.

14.     While writing the warning citation, Deputy Crane asked Lett who the vehicle belonged to, and Lett stated that it belonged to his girlfriend's brother.

3

15.   An inquiry made to the Georgia Crime Information Center revealed that the vehicle was registered to Cedric Deon Gude and Terry Williams, who were not present at the traffic stop.

16.   When asked about his travel itinerary by Deputy Crane, Lett indicated that they were traveling to Sandy Springs, Georgia, to look at some houses, and had been on the road for approximately two to three hours.

17.   Deputy Crane asked Lett if he was under any type of doctor's care, and Lett indicated that he was currently taking medication for pain.

18.   When asked by Deputy Crane if Lett had been drinking, Lett laughed and stated that he had not, but Durr had been drinking. Lett further indicated that he had picked Durr up from a club.

19.   Deputy Crane asked Lett if the medication he was taking made him drowsy and Lett stated that they did not.

20.   Based on the strong odor of alcohol and marijuana, Deputy Crane asked Lett if there were any open containers or drugs inside the vehicle. Lett stated that there was not.

21.   Deputy Crane asked for and received consent from Lett to search the vehicle.

22.   Based on Deputy Crane's previous observation of something protruding from Durr's front left pant's pocket, Deputy Crane asked and received consent from him to search his person.

23.   A search of Durr's person revealed a large amount of United States currency in his front left pant's pocket. Durr indicated to Deputy Crane that he had been at the Play Boy strip club located in Dothan, Alabama, all night.

4

24.     Deputy Crane asked Durr if he had any more currency, and Durr indicated that he did not.

25.     Deputy Chris Gillilands and Sergeant David Stanford of the HCSO arrived at the scene to provide assistance.

26.     A search of the vehicle revealed a blue and white plastic bag under the front passenger seat which contained a large amount of United States currency.  The currency was wrapped in colored rubber bands.

27.     After being asked several times by Deputy Crane who the currency belonged to, Lett motioned towards Durr indicating that it belonged to him.

28.     When Deputy Crane asked Durr if the currency belonged to him, Durr initially hesitated and eventually stated that it did.  Durr further indicated that the currency belonged to him, his father, and his grandmother.

29.     Deputy Crane asked Durr if the currency was bundled in thousand dollar increments, and Durr stated that it was.

30.     When asked by Deputy Crane about their travel itinerary, Durr indicated that they were traveling to Atlanta, Georgia.

31.     When asked by Deputy Crane if they were employed, Lett stated that he was not, and Durr stated that he had been working for Budweiser for the last eight years.

32.     A criminal history records check revealed that both Lett and Durr have had prior arrests and convictions for narcotics violations.

33.     The Defendant Property was seized for a total amount of $21,175.00.

34.     Lett and Durr followed the officers to the HCSO, and received a receipt for the seized currency.

5

35.    At the HCSO, Deputy Dwight Duke utilized a dog, trained to detect the odor of certain controlled substances, ("K-9") to conduct a sweep of the vehicle and seized currency.  The K-9 gave a positive alert to an odor of illegal narcotics on the vehicle and currency.

### Conclusion

36.    Based on the foregoing, probable cause exists to believe that the Defendant Property constitutes money furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, punishable by more than one year's imprisonment, constitutes proceeds traceable to such an exchange, and/or constitutes money used or intended to be used to facilitate a violation of the Controlled Substances Act, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the Defendant Property; that due notice be given to all parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendant Property forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED, April 13, 2011.

MICHAEL J. MOORE
UNITED STATES ATTORNEY


By:   s/ DANIAL E. BENNETT
ASSISTANT UNITED STATES ATTORNEY
GEORGIA STATE BAR NO.  052683
UNITED STATES ATTORNEY'S OFFICE
Post Office Box 1702
Macon, Georgia 31202-1702
Telephone: (478) 752-3511
Facsimile: (478) 621-2712